501 A.2d 1307

## BALTIMORE GAS AND ELECTRIC COMPANY

v.

## PUBLIC SERVICE COMMISSION OF MARYLAND et al.

No. 27, Sept. Term, 1985.

Court of Appeals of Maryland.

Jan. 8, 1986.

H. Thomas Howell and John H. Mudd (Anthony W. Kraus and Semmes, Bowen & Semmes and David A. Brune and Paul W. Davis, on the brief), Baltimore, for appellant.

Kirk J. Emge, General Counsel, Baltimore, for Public Service Com'n of Maryland.

Thomas C. Gorak, Asst. People's Counsel (John K. Keane, Jr., Maryland People's Counsel, on brief), Baltimore, for Maryland People's Counsel.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

MURPHY, Chief Judge.

Maryland Code (1957, 1980 Repl.Vol.) Article 78,[1] § 54F provides a procedure through which large electric utility companies may obtain expedited review by the Public Service Commission (the "Commission") of applications for adjustment of their fuel rates.[2] In this case, we are called upon to consider for the first time the manner in which the Commission has implemented § 54F.

## I.

An electric utility company is authorized by statute to charge its customers "just and reasonable rates," as determined by the Commission. §§ 28(d), 68(a). These rates must enable the company to recover its "necessary and proper expenses" and to provide a "reasonable return" to the company's investors. § 69(a); *see Potomac Edison Co. v. PSC*, 279 Md. 573, 579–82, 369 A.2d 1035 (1977); *Public Serv. Comm'n v. Baltimore Gas & El.*, 273 Md. 357, 363–64, 329 A.2d 691 (1974); *C. & P. Tel. Co. v. Public Service*, 230 Md. 395, 400–01, 187 A.2d 475 (1963). *See generally* E. Nichols, *Ruling Principles of Utility Regulation* 1–9 (1955 & Supp.1964).

Prior to 1955, changes in a company's expenses, including its fuel costs, were reviewed by the Commission only as part of a lengthy base rate proceeding. As a result, a substantial regulatory lag generally existed between the

---

1. Unless otherwise indicated, all statutory provisions cited in this opinion are within Article 78. The article itself will be referred to by its short title, The Public Service Commission Law. *See* § 107.

2. A fuel rate is a prescribed figure, stated as a monetary amount per kilowatt hour, that is used in calculating the charge an electric utility company is permitted to assess its customers to recover its actual fuel costs.

time increased or decreased costs were incurred by a company and the time those costs were reflected in customer rates.

As part of its comprehensive revision of the Public Service Commission Law in 1955, the General Assembly acted to alleviate this regulatory lag with regard to fuel cost recovery by enacting chapter 441 of the Acts of 1955. This statutory provision, now codified as part of § 54, provided that "[a]ny ... electric company may establish a sliding scale for the automatic adjustment of charges for ... electricity ...." Under the authority of this provision, most electric utility companies, including the Baltimore Gas and Electric Company ("BG & E"), amended their tariff schedules to include fuel rate adjustment clauses. A fuel rate adjustment clause permits a company to adjust its rates automatically, subject to later Commission approval, to reflect changes in fuel costs.

As fossil fuel prices increased dramatically during the mid-1970s, the General Assembly acted to subject the rising fuel costs experienced by electric utility companies, and ultimately paid by consumers, to closer scrutiny by the Commission. By chapter 418 of the Acts of 1975, the legislature enacted § 54D, which required companies using fuel rate adjustment clauses "to verify and justify the adjusted fuel costs to the Commission" on a monthly basis. Section 54D was amended by chapter 695 of the Acts of 1977 to direct the Commission to disallow any charge a company had passed on to its customers through a fuel rate adjustment clause if the company "has improperly calculated the charge, has failed to use proper fuel procurement practices, or has used this charge to the detriment of the public."

In 1978, the General Assembly removed large electric utility companies from the purview of § 54D and enacted

§ 54F, which provides a discrete procedure through which these companies may adjust their fuel rates.[3] *See* Acts of 1978, chapter 173. The procedure provided by § 54F differs from that of § 54D in several significant respects, two of which are particularly relevant here. First, § 54F furnishes the Commission with more definite standards than does § 54D for evaluating fuel rate adjustment applications. Specifically, § 54F(f) directs the Commission to base its decision in a fuel rate adjustment proceeding upon its findings regarding whether

"(1) Only changes in the actual costs of the components of the fuel rate are included in the proposed change;

(2) The applicant has used the most economical mix of all types of generation and purchase;

(3) The applicant has made every reasonable effort to minimize fuel costs and followed competitive procurement practices;

(4) The applicant has maintained the productive capacity of all its generating plants at a reasonable level."

Section 54F(g) authorizes the Commission to disallow recovery of increased fuel costs that were incurred as a result of a company's failure to comply with these requirements. In addition, while § 54D sets no limit upon the amount of time within which the Commission must review an application and issue a final order, § 54F(c) expressly provides that "[t]he Commission's final order shall be issued promptly but in no event later than 90 days after the filing of the application." [4]

---

**3.** The procedure provided by § 54F is available only to electric utility companies that produce or generate power and whose gross annual revenues exceed $25 million. § 54F(a). The four companies that meet this requirement are BG&E, the Delmarva Power and Light Company, the Potomac Edison Company, and the Potomac Electric Power Company.

**4.** By chapter 192 of the Acts of 1983, the 90-day time period in § 54F(c) was extended to 120 days. Because this amendment did not take effect until July 1, 1983, it is inapplicable to the case before us.

## II.

This appeal arises from three fuel rate adjustment cases initiated by BG & E and conducted by the Commission under the authority of § 54F. BG & E filed its application in the first of these cases, Case No. 7238–O ("Case O"), on March 2, 1981. In conformance with industry custom, BG & E included among the fuel costs stipulated in its application certain costs it incurred in purchasing supplemental power for its customers during a forced outage that occurred in December 1980 and January 1981 at one of its nuclear generating units.[5] The Commission suspended BG & E's proposed fuel rate adjustment for 30 days, the maximum suspension permitted by § 54F(c), and authorized BG & E to apply the proposed rate, subject to further review by the Commission, beginning with its April 1981 billings.

After conducting evidentiary hearings, the Commission issued its Order No. 65299 on June 1, 1981, 90 days after the application's filing. In the order, the Commission discussed the circumstances surrounding the forced outage and concluded that, because BG & E had failed to demonstrate that the forced outage was not the result of imprudent management, it had not met its burden of proving that it had maintained the productive capacity of all its generating plants at a reasonable level, as required by § 54F(f)(4). The Commission also recognized, however, that BG & E had achieved an excellent overall record in maintaining the output of its nuclear units. The Commission therefore concluded that BG & E would be permitted to recover 50% of the purchased power costs occasioned by the outage.

---

5. An outage is an interruption in power production at a generating plant, and may be either planned or forced: a planned outage is scheduled in advance for such purposes as routine maintenance or equipment installation; a forced outage in contrast is unscheduled and is typically caused by equipment failure, human error, or other operational problems.

BG&E testified that the total cost of purchased power resulting from this forced outage was $6.455 million.

The order further provided that the Commission would retain jurisdiction to consider additional evidence regarding the extent of BG & E's responsibility for the outage, and indicated that the Commission might reconsider its apportionment of the purchased power costs in light of this additional evidence.

The Commission issued its Order No. 66011 in Case O on November 22, 1982, 630 days after BG & E filed its application. In its order, the Commission concluded that, in light of the additional evidence it had reviewed, BG & E would be permitted to recover 75% of the purchased power costs resulting from the forced outage. The order also purported to terminate Case O on the Commission's docket.

The second fuel rate adjustment case before us in this appeal, Case No. 7238-T ("Case T"), was initiated by BG & E's filing of its application on February 1, 1982. The Commission suspended the proposed rate adjustment for the maximum permissible period of 30 days and authorized BG & E to apply the proposed rate, subject to further review by the Commission, beginning with its March 1982 billings. BG & E filed its application in the third proceeding, Case No. 7238-U ("Case U"), on March 1, 1982. Again, the Commission suspended the proposed adjustment for 30 days and authorized BG & E to apply the proposed rate, subject to further Commission review, beginning with its April 1982 billings. Cases T and U were then consolidated for evidentiary hearings before the Commission. The fuel costs submitted in BG & E's applications in Cases T and U included certain purchased power costs occasioned by a forced outage at one of the company's nuclear generating units during July 1981.[6]

On April 2, 1982, the hearing examiner issued a proposed order in Case T authorizing BG & E to continue to assess the full amount of the proposed fuel rate adjustment, and

---

**6.** BG&E testified that the total cost of purchased power resulting from this forced outage was $6.327 million.

providing that the Commission would retain jurisdiction to further review all the issues in the case. The proposed order became final by its terms as Commission Order No. 65755 on May 3, 1982, 90 days after BG & E had filed its application in Case T. Subsequently, after conducting evidentiary hearings, the Commission issued its Order No. 65800 in the consolidated Cases T and U, by which it allowed the full fuel rate adjustment requested in BG & E's application in Case U to remain in effect pending further Commission review and indicated that it would retain jurisdiction over the consolidated cases. Order No. 65800 was issued on May 28, 1982, 88 days after the filing of BG & E's application in Case U.

On November 22, 1982, the Commission issued its Order No. 66012 in the consolidated Cases T and U, 266 days and 294 days, respectively, after BG & E's filing of its applications in these cases. In the order, the Commission discussed the circumstances surrounding the forced outage in July 1981 and concluded that, in light of the additional evidence it had reviewed, BG & E would be permitted to recover from its customers only 25% of the purchased power costs occasioned by the forced outage. This conclusion was based upon the Commission's findings that, although BG & E had achieved a superior overall record at the nuclear generating unit during the previous year, the July outage was attributable to managerial imprudence, and the company had therefore failed to prove that it had maintained the productive capacity of all its generating units at a reasonable level, as required by § 54F(f)(4). The order also purported to terminate the consolidated Cases T and U on the Commission's docket.

On November 29, 1982, BG & E filed a notice of appeal from the Commission's Order No. 66011 in Case O and Order No. 66012 in the consolidated Cases T and U, seeking full recovery of the disputed purchased power costs. On December 10, 1982, the Maryland People's Counsel cross-appealed, contending that BG & E was not entitled to recover

any of the disputed costs. These appeals were consolidated and tried before the Circuit Court for Calvert County.

BG & E raised numerous issues in the circuit court, challenging the accuracy of the Commission's interpretation of § 54F(f), the legality of the procedure through which the Commission had evaluated BG & E's applications, and the correctness of the Commission's final decisions in the three cases. The circuit court reversed both of the Commission's orders on two grounds: (1) that § 54F(f)(4) did not authorize the Commission to inquire into the cause of specific forced outages, and (2) that the standards the Commission had applied in implementing § 54F(f) were rules illegally promulgated by the Commission in violation of the State Documents Law, Maryland Code (1957, 1982 Repl.Vol.) Art. 41, §§ 256B–256T. The court remanded the cases to the Commission for entry of orders allowing BG & E to recover all of the disputed fuel costs.

From the judgment of the circuit court, both the Commission and the People's Counsel filed notices of appeal to the Court of Special Appeals. Judge Bishop, writing for the intermediate appellate court, reversed and remanded the case for affirmance of the Commission's orders. *Public Serv. Comm'n v. Baltimore Gas & Elec.*, 60 Md.App. 495, 483 A.2d 796 (1984). We granted BG & E's petition for certiorari, and shall affirm the judgment of the Court of Special Appeals.

### III.

A. The 90-Day Provision of § 54F(c)

As a preliminary matter, BG & E maintains that § 54F(c) constitutes a limitation on the Commission's jurisdiction over fuel rate adjustment proceedings. As BG & E reads the statute, § 54F(c) not only requires the Commission to issue its final order within 90 days of the filing of an application, but also divests the Commission of jurisdiction after the ninetieth day, thereby rendering any further action by the Commission "ineffectual" and a "total nullity."

From this premise, BG & E concludes that the orders the Commission issued in Cases O, T, and U within the 90-day periods constitute the Commission's final actions in these cases, and are therefore still in effect.

■ By reading § 54F(c) in isolation from the rest of the Public Service Commission Law, BG & E has misconstrued the nature of the 90-day deadline. As we have indicated frequently, a provision contained within an integrated statutory scheme must be understood in that context and harmonized to the extent possible with the other provisions of the statutory scheme. *See, e.g., Guardian Life Ins. v. Ins. Comm'r,* 293 Md. 629, 643–45, 446 A.2d 1140 (1982); *In re Stephen K.,* 289 Md. 294, 298–99, 424 A.2d 153 (1981); *Comptroller v. John C. Louis Co.,* 285 Md. 527, 538–39, 404 A.2d 1045 (1979); *Mazor v. State Dep't of Correction,* 279 Md. 355, 361, 369 A.2d 82 (1977); *Blumenthal v. Clerk of Cir. Ct.,* 278 Md. 398, 403, 365 A.2d 279 (1976); *Parker v. Junior Press Printing,* 266 Md. 721, 725–26, 296 A.2d 377 (1972).

■ To understand the effect of the Commission's purported exercise of jurisdiction beyond the 90-day period of § 54F(c), we must consider other relevant provisions of the Public Service Commission Law. Section 86(d) provides that "[t]he Commission shall have the authority, on its own motion, to rehear any final order...." Furthermore, § 86(c) states that "[t]he Commission may consider on rehearing facts not presented in the original hearing ... and may by new order abrogate, change, or modify its original order." Reading these sections in conjunction with § 54F(c), it is clear that the Commission possesses the requisite jurisdiction to rehear a final order issued in a § 54F fuel rate adjustment proceeding, and to consider additional facts on rehearing.[7]

---

7. The broad grant of authority in § 86(d) to rehear final orders is, we believe, impliedly limited by § 91, which authorizes the circuit court to assume jurisdiction over a final order of the Commission upon

■ That the Commission did not characterize its actions as final orders followed by rehearings is not dispositive. Section 1 of the Public Service Commission Law requires that "[t]he powers of the Commission shall be liberally construed," and to exhalt form over substance would be inconsistent with this mandate. Furthermore, we are satisfied that by issuing orders in each of the three cases by the 90-day deadlines, the Commission accomplished the purpose underlying § 54F(c): providing expedited adjustment of electric utility companies' fuel rates. We therefore conclude that the orders issued by the Commission in Cases O, T, and U within the 90-day periods were final orders within the meaning of § 54F(c), and that the subsequent issuance of the two orders on November 22, 1982, was a valid exercise of the Commission's authority under § 86(d).

■ BG & E places great weight on the introductory phrase in § 54F(c), "[n]otwithstanding any other provisions of this article," interpreting it to mean that in construing § 54F we must not look beyond the language of this single section. As we read it, this phrase simply means that the procedure set forth in § 54F controls within its area of applicability in spite of any apparent conflict with other parts of the Public Service Commission Law. It does not mean that § 54F must be interpreted in a vacuum, without due consideration of other consistent and complementary portions of the article.

B. The Commission's Interpretation of § 54F(f)(4)

In reviewing BG & E's applications in Cases O, T, and U, the Commission concluded that BG & E had satisfied the requirements of paragraphs (1), (2), and (3) of § 54F(f). In each case, the Commission denied BG & E recovery of a portion of its fuel costs solely on the ground that BG & E had failed to meet its burden of proving that it had "maintained the productive capacity of all its generating plants at

petition of an interested party. Once the circuit court has assumed jurisdiction in such a case, its jurisdiction is exclusive.

a reasonable level," as required by § 54F(f)(4). BG & E argues that the Commission has misinterpreted this statutory language, and that both of the Commission's orders issued on November 22, 1982, must therefore be vacated.

The controversy turns upon the meaning to be ascribed to the term "reasonable level." In BG & E's view, these words are susceptible of but a single interpretation: a level of productive capacity that compares favorably with a statistical reference standard accepted by the Commission. The Commission has acknowledged that the overall performance of the nuclear unit that experienced the two forced outages was outstanding compared to industry averages during each of the years in which the outages occurred. BG & E insists that the level of productive capacity at this unit was therefore reasonable as a matter of law, and that the Commission lacked statutory authority to conduct further inquiry into the cause of specific forced outages.

█ We do not agree that the term "reasonable level" is susceptible of only one interpretation. "Reasonable level" is a vague term, and its presence in an administrative statute such as the Public Service Commission Law suggests that the General Assembly intended to entrust the formulation of specific standards to the technical expertise of those charged with enforcing the statute. *See Springfield Ed. Ass'n v. Springfield, Etc.*, 290 Or. 217, 621 P.2d 547, 555–57 (1980); *Brix v. City of San Rafael*, 92 Cal. App.3d 47, 50–51, 154 Cal.Rptr. 647 (Cal.Ct.App.1979); *Roberts v. Police & Firemen's Retirement, Etc.*, 412 A.2d 47, 50 (D.C.1980); *Kopp v. State*, 100 Idaho 160, 595 P.2d 309, 312 (1979); *WIPE v. Illinois Pollution Control Bd.*, 55 Ill.App.3d 475, 13 Ill.Dec. 149, 152, 370 N.E.2d 1176, 1179 (Ill.App.Ct.1977).

The Commission has interpreted "reasonable level" to mean a level that compares favorably with a statistical reference standard and that has not been reduced as a result of managerial imprudence. In its Order No. 66011

issued in Case O, the Commission summarized the procedure through which it implements § 54F(f)(4) as follows:

"[T]he first step in determining whether the requirements of Section 54F(f)(4) have been met is to measure the plant's performance on the basis of equivalent availability factors which take into account outages, partial outages and deratings. The productive capacity of the plant will be measured by a comparison of the performance for the most recent 12-month period against (a) the plant's own performance record averaged over the last three years, or (b) the availability factor, such as compiled by the North American Electric Reliability Council ('NAERC'), for similar size units, whichever is higher. If the plant's actual performance equals or exceeds the higher of the two standards, then there is a rebuttable presumption that the Company has complied with Section 54F(f)(4).

"However, if the actual performance falls below the higher of the two standards or if evidence indicates that a specific outage or series of outages may be the result of imprudent management, the Commission will review the facts and circumstances surrounding the specific outages at the generating plant in question. In reviewing the factual circumstances associated with a particular outage, the Commission recognizes that forced outages cannot be completely eliminated or controlled. . . .

". . . Therefore, an outage occasioned by human error is not a *per se* violation of this statutory standard. However, a decision must be made by the Commission as to whether the facts and decisions associated with the incident constituted mismanagement. In making this determination, the Commission will examine the extent to which the increased costs for replacement generation could have been avoided through better planning, preventive maintenance, more diligent efforts, closer supervision, and more prudent management. Specifically, in reviewing a particular outage, the Commission will examine whether the Company had instituted reasonable and appropriate procedures to prevent human error or equip-

ment failure and to minimize the consequences of those occurrences.

"The Commission recognizes that as more review and monitoring steps are added to a plant's maintenance procedures, the cost of maintenance will increase as will the length of planned outages thereby lowering the plant's operating factor and efficiency. Thus, in determining whether the Company's management has taken reasonable steps to prevent employee error or equipment failure and to minimize the consequences of such occurrences, the Commission will weigh the costs associated with the additional control procedures against the foreseeable cost consequences of operating the plant without those procedures."

█ The weight to be accorded an agency's interpretation of a statute depends upon a number of considerations. Although never binding upon the courts, the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time. *See National Asphalt v. Prince Geo's Co.,* 292 Md. 75, 80, 437 A.2d 651 (1981); *Holy Cross Hosp. v. Health Services,* 283 Md. 677, 685, 393 A.2d 181 (1978); *Demory Brothers v. Bd. of Pub. Works,* 273 Md. 320, 327, 329 A.2d 674 (1974); *Farber's, Inc. v. Comptroller,* 266 Md. 44, 50–51, 291 A.2d 658 (1972); *see also* 5 K. Davis, *Administrative Law Treatise* § 29.16 (2d ed. 1984); 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 49.05, .07, .08 (rev. 4th ed. 1984).

█ Another important consideration is the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation of the statute. When an agency clearly demonstrates that it has focused its attention on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretation through a sound reasoning process, the agency's interpretation will be accorded the persuasiveness due a well-

considered opinion of an expert body. *See SEC v. Sloan,* 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978); *John C. Louis, supra,* 285 Md. at 544, 404 A.2d 1045.

In addition, the nature of the process through which the agency arrived at its interpretation is a relevant consideration in assessing the weight to be accorded the agency's interpretation. If the interpretation is the product of neither contested adversarial proceedings nor formal rule promulgation, it is entitled to little weight. *See John C. Louis, supra,* 285 Md. at 544, 404 A.2d 1045; 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 49.05 (rev. 4th ed. 1984).

The Commission's interpretation of § 54F(f)(4) originated in a series of public proceedings conducted shortly after the statute's enactment. On June 19, 1978, by its Order No. 63190, the Commission instituted proceedings to develop guidelines and procedures to implement § 54F. Separate proceedings were instituted for each of the four electric utility companies affected by this section.[8] During the proceedings, representatives of the electric companies, the People's Counsel, and the Commission staff testified and presented evidence in support of their views regarding the implementation of § 54F. Public hearings were also conducted to elicit the views of the companies' customers.[9]

On August 23, 1978, the Commission issued virtually identical interim orders in each of the four cases.[10] In these

---

**8.** *See* Re Baltimore Gas & Electric Co., Case No. 7238; Re Delmarva Power & Light Co., Case No. 7239; Re Potomac Electric Power Co., Case No. 7240; Re Potomac Edison Co., Case No. 7241.

**9.** Advertisements indicating the time, date, place, and purpose of these public hearings were published in newspapers of general circulation in each company's service area.

**10.** *See* Case No. 7238, Order No. 63301; Case No. 7239, Order No. 63302; Case No. 7240, Order No. 63303; Case No. 7241, Order No. 63304.

orders, the Commission adopted standards and procedures for the evaluation of the companies' initial applications filed in response to § 54F. Appended to each order were several uniform reporting forms. One of these forms, Md. PSC Form No. 3, required that each company provide the Commission with information regarding individual outages at generating plants. Each order further provided that "if the information which is provided [in Form No. 3] raises questions, more detailed information can then be requested."

On August 31, 1978, each of the four electric companies filed its initial application under § 54F. On November 29, 1978, after conducting additional adjudicatory proceedings, the Commission issued orders in which it concluded that each company had maintained the productive capacity of all its generating plants at a reasonable level, in compliance with § 54F(f)(4).[11] In evaluating the levels of productive capacity of the companies' plants, the Commission considered relevant industry statistics as well as evidence regarding specific outages and other incidents of reduced generation at the companies' plants. For example, in its Order No. 63453, the Commission based its approval of BG & E's initial application in part upon evidence that "the availability of the company's generating units is well above industry averages." However, in the same order, the Commission observed that the Keystone and Conemaugh plants, of which BG & E was a joint owner, "seem to be beset with boiler problems which result in reduced generation availability...." Although concluding that based upon the record in that proceeding BG & E's application should be approved as filed, the Commission indicated that it would continue to "examine the effect on the fuel rate of any inefficiencies in the operation of these plants in subsequent fuel rate adjustment proceedings."

---

**11.** *See* Case No. 7238, Order No. 63453; Case No. 7239, Order No. 63454; Case No. 7240, Order No. 63455; Case No. 7241, Order No. 63456.

The following year the Commission, applying the same interpretation of § 54F(f)(4), disallowed BG & E's recovery of increased fuel costs incurred as a result of a forced outage at one of BG & E's nuclear generating units. *See* Case No. 7238–B, Order No. 63804 (May 29, 1979). Again, evidence was introduced that BG & E's level of productive capacity compared favorably to industry averages. The Commission, nevertheless, conducted further investigation into the cause of the outage, observing that

"[t]he inquiry has to be directed to what extent the increased costs for replacement generation could have been avoided through, i.e., better planning, preventive maintenance, more diligent efforts, closer supervision, and more prudent management. Such a finding can only be made if the performance of each individual plant is examined and cannot be based solely on the satisfactory performance level of the system as a whole.

". . . Based upon the need to examine circumstances surrounding any outage, the commission finds that conclusions with respect to the reasonableness of performance levels cannot automatically be made on the basis of the statistical comparison."

In light of this standard, and the evidence in the record, the Commission concluded that BG & E had failed to meet its burden under § 54F(f)(4).

In another case conducted later in 1979, the Commission repeated the language quoted above, adding that "[a] comparison of the equivalent availability factors will indicate where further inquiry into the performance level of an individual plant is required...." Case No. 7239–B, Order No. 63810 (June 12, 1979). Essentially the same interpretation was applied in every subsequent fuel rate adjustment proceeding.[12]

---

12. *See, e.g.,* Case No. 7238–C, Order No. 63838 (June 28, 1979) ("an electric company must present substantial evidence which establishes that any forced outage necessitating the purchase of higher cost replacement energy ... resulted from causes which were not attribut-

It is clear that the interpretation the Commission initially placed upon § 54F(f)(4) was further developed and refined in subsequent contested proceedings during the four years between the initial proceedings in 1978 and the issuance of the two orders which are the subject of the case now before us. Of course, the orderly growth and development of legal principles is an important function of such contested proceedings. We find no merit, however, in BG & E's contention that the interpretation of § 54F(f)(4) set forth in the November 22, 1982, orders represented a significant departure from the Commission's past practice. We conclude that the interpretation of § 54F(f)(4) applied by the Commission in the present case is entitled to considerable weight as a contemporaneous agency interpretation consistently adhered to for four years.

The analysis provided in the orders issued by the Commission during the initial proceedings in 1978, as well as in its subsequent orders, demonstrates the thoroughness with which the Commission considered the scope of its mandate under § 54F, the legislative policy underlying the statute, and the evidence presented during the proceedings. The interpretation of § 54F(f)(4) which the Commission formulated and applied in these contested proceedings is entirely consistent with the language and purpose of the statute. Furthermore, the interpretation is consistent with the general principle of utility regulation that costs incurred by a utility company as a result of managerial imprudence cannot be recovered from the company's customers. *See C. & P. Tel. Co., supra,* 230 Md. at 411–14, 187 A.2d 475; *Florida Power Corp. v. Cresse,* 413 So.2d 1187, 1189–91

---

able to any fault of that company"); Case No. 7238–F, Order No. 64132 (November 30, 1979) (§ 54F(f)(4) "requires an examination of the performance of each individual plant, with the inquiry directed to what extent the increased costs for replacement generation could have been avoided through, i.e., better planning, preventive maintenance, more diligent efforts, closer supervision, and more prudent management"); Case No. 7239–E, Order No. 64133 (November 30, 1979) (same language as Order No. 64132, *supra* ).

(Fla.1982); *Virginia Elec. v. Division of Consumer Counsel*, 220 Va. 930, 265 S.E.2d 697, 700–01 (1980); *see also* G. Turner, *Trends and Topics in Utility Regulation* 372–75, 811–12 (1969). We are therefore persuaded that the Commission has correctly interpreted § 54F(f)(4).

### C. The State Documents Law

BG & E next argues that the standards through which the Commission implemented § 54F(f)(4) constituted rules illegally promulgated in violation of the State Documents Law, Maryland Code (1957, 1982 Repl.Vol.) Art. 41, §§ 256B–256T.[13] The State Documents Law requires, *inter alia*, that notice of proposed agency rulemaking and the text of proposed agency rules be published in the Maryland Register, § 256F(b)(2), (3), and that the text of the adopted agency rules be published in both the Maryland Register and the Code of Maryland Regulations, §§ 256C(b)(2), 256F(b)(1). The Commission was made subject to the State Documents Law by chapter 858 of the Acts of 1978.

The word "rule" is defined for purposes of the State Documents Law by reference to the Administrative Procedure Act, Maryland Code (1957, 1982 Repl.Vol.) Art. 41, §§ 244–256A.[14] Section 244(c) of the Administrative Procedure Act broadly defines "rule" as follows:

> "*Rule*' includes every regulation, standard, guideline, or statement of policy or interpretation of general application and future effect, including the amendment or repeal thereof, adopted by an agency, whether with or without

---

**13.** The State Documents Law was repealed by chapter 284 of the Acts of 1984. The statutory notice provisions governing the promulgation of agency rules are now codified at Maryland Code (1984, 1985 Supp.), §§ 7–201 to –222 of the State Government Article.

**14.** By chapter 284 of the Acts of 1984, the Administrative Procedure Act was revised and recodified as §§ 10–101 to –405 of the State Government Article. The recodification substituted the defined term "regulation" for the former defined term "rule." *See* § 10–101(e) and accompanying Revisor's Note. Because we are applying the law as it existed in 1982, we will use the term "rule" in this opinion.

prior hearing, to implement or make specific the law enforced or administered by it or to govern its organization, procedure, or the practice before such agency, but does not include regulations concerning only the internal management of the agency and not directly affecting the rights of or procedures available to the public, responses to petitions for adoption of rules issued pursuant to § 248 of this article, or declaratory rulings issued pursuant to § 250 of this article."

 Section 85(a) of the Public Service Commission Law provides that "[e]very decision and order of the Commission in any contested proceeding shall be based upon a consideration of the record, shall be in writing and shall state the grounds for the Commission's conclusions." Thus, the Commission is required to articulate the standards through which it applied the applicable law to the relevant facts in reaching its decision in a contested proceeding. Furthermore, such standards will often have a degree of general application and future effect. Although the principle of *stare decisis* has limited applicability to administrative agencies, as a practical matter agencies frequently do use their prior decisions as precedents, and the standards through which a statute is implemented in one proceeding may well reappear in later proceedings. *See* 4 K. Davis, *Administrative Law Treatise* § 20:9, :11 (2d ed. 1983); 73A C.J.S. *Public Administrative Law & Procedure* § 157 (1983).

To conclude, however, that every time an agency explains the standards through which it applies a statute in a contested proceeding it is promulgating rules, and must therefore comply with the notice requirements of the State Documents Law, would be patently unreasonable. The administrative adjudicatory process is designed primarily to resolve concrete disputes between parties, rather than to establish abstract principles of general applicability. BG & E's interpretation would impose a tremendous, and unnecessary, burden upon state agencies, rendering the administrative adjudicatory process all but unworkable. Statutes

should be construed to avoid such absurd consequences. *See In re Special Investigation No. 281*, 299 Md. 181, 200, 473 A.2d 1 (1984); *Mazor, supra*, 279 Md. at 361, 369 A.2d 82; *Blocher v. Harlow*, 268 Md. 571, 584, 303 A.2d 395 (1973); 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 45.12 (rev. 4th ed. 1984).

 In the cases before us, the Commission did not abstractly formulate new rules of binding and universal future effect, but simply articulated the standards through which it interpreted and implemented § 54F(f)(4) during the course of specific contested proceedings, as it was required to do by § 85(a). The standards were applied only to the facts and circumstances of those proceedings, and necessarily determined the legal rights and obligations of only the parties to the proceedings. We hold, therefore, that the standards through which the Commission implemented § 54F(f)(4) did not constitute rules within the meaning of the State Documents Law, but were simply part of the "grounds for the Commission's conclusions" announced in compliance with § 85(a). *See generally* 2 K. Davis, *Administrative Law Treatise* § 7:2 (2d ed. 1979).

D. Rulemaking *versus* Adjudication

BG & E further argues that, if the standards applied in Cases O, T, and U were not rules, then this in itself constituted error by the Commission. That is, BG & E maintains that in developing these standards the Commission should have proceeded by formal rulemaking rather than by adjudication.

It is a well settled principle of administrative law that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). *See also NAACP v. FPC*, 425 U.S. 662, 668, 96 S.Ct. 1806, 1810, 48 L.Ed.2d 284 (1976); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 291–95, 94 S.Ct. 1757,

1770–72, 40 L.Ed.2d 134 (1974); *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 753–54, 501 A.2d 48 (1985). As the Supreme Court of the United States explained in *Chenery,*

> "[t]he function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. ... Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity."

332 U.S. at 202, 67 S.Ct. at 1580.

*See generally* 2 K. Davis, *Administrative Law Treatise* § 7:25 (2d ed.1979 & Supp.1982).

■ We find no evidence that the Commission abused its discretion in choosing to proceed by adjudication in interpreting and implementing § 54F(f)(4). As already indicated, the interpretation of § 54F(f)(4) that the Commission applied in the cases before us does not differ significantly from that originally articulated by the Commission shortly after the statute's enactment. This is not a case, therefore, in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the Commission's past pronouncements. *Cf. National Gas, Etc. v. Fed. Energy Reg. Com'n,* 590 F.2d 664, 669–70 (7th Cir.1979) (agency not permitted to reverse abruptly during adjudication long-standing practice where regulated companies had acted in substantial reliance upon existing practice).

Furthermore, at the time the orders in question were issued in Cases O, T, and U, the Commission was already well aware of the views of the other three companies affected by the statute. Indeed, the standards applied in these cases were originally developed and subsequently refined during contested proceedings involving all of the companies subject to § 54F. The Commission was therefore entirely justified in rendering its decisions in Cases O, T, and U without conducting rulemaking proceedings to elicit the views of these other three companies.

E. The Commission's Orders

Having upheld both the Commission's interpretation of § 54F and the legality of the procedure through which it implemented this statute in Cases O, T, and U, we turn lastly to BG&E's challenge that the Commission's orders in these cases were "unlawful, arbitrary, and capricious." In reviewing an order of the Commission, we are constrained by § 97 to limit the scope of our inquiry:

"Every final decision, order, rule or regulation of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be (1) in violation of constitutional provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole."

 In light of § 97, we have consistently held that Commission orders enjoy a high degree of judicial deference on review. *See, e.g., Public Service Comm'n v. Patuxent Valley*, 300 Md. 200, 216–17, 477 A.2d 759 (1984); *Potomac Edison, supra*, 279 Md. at 582–83, 369 A.2d 1035; *Baltimore Gas, supra*, 273 Md. at 361–63, 329 A.2d 691. Recognizing the experience and special expertise of the Commission and its staff, a reviewing court must not substitute its judgment for that of the Commission. *Potomac Edison,*

*supra,* 279 Md. at 582–83, 369 A.2d 1035; *Baltimore Gas, supra,* 273 Md. at 362, 329 A.2d 691; *Baltimore Trans. Co. v. Pub. Ser. Comm.,* 206 Md. 533, 558, 112 A.2d 687 (1955). Indeed, a reviewing court must uphold a Commission order on appeal unless the party challenging the order demonstrates by clear and satisfactory evidence that the order is unlawful or unreasonable. *Baltimore Gas, supra,* 273 Md. at 362, 329 A.2d 691; *Baltimore Trans., supra,* 206 Md. at 558, 112 A.2d 687; *Montgomery Co. v. Pub. Ser. Comm.,* 203 Md. 79, 84, 98 A.2d 15 (1953).

In *Baltimore Gas, supra,* we reaffirmed our adherence to the principles of judicial review articulated for the Court by Chief Judge Hammond in *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 236 A.2d 282 (1967):

"[The court's] appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions.... [J]udicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment." 248 Md. at 309–10, 236 A.2d 282.

BG&E first argues that in holding the company's management responsible for the forced outages in Cases O, T, and U, the Commission imposed a standard requiring perfect hindsight and nearly perfect performance. The record in these cases belies this argument. In investigating both of the outages in question, the Commission carefully considered the likelihood of the types of accidents that occurred, the foreseeable costs resulting from such accidents, and the cost and efficacy of preventive measures. The Commission concluded that BG&E had failed to implement cost-effective procedures that might well have pre-

vented the outages. We believe this conclusion was reasonable and supported by substantial evidence.

In Case O, the record contained substantial evidence that the outage was caused by a standard ½ inch nut having fallen into the thrust bearing of the main turbine during a routine maintenance procedure. There was undisputed evidence that similar accidents had occurred before, although none had ever resulted in an outage. BG&E offered testimony that it has a policy of requiring its employees to notify a supervisor if they are unable to account for a tool or piece of equipment that may have been lost in the vicinity of a critical maintenance project. BG&E also indicated that, to encourage compliance with this policy, it takes no disciplinary action against employees who report missing tools or equipment.

While endorsing this policy, the Commission concluded that it had been poorly implemented. The policy was apparently never written down; employees learned of it, if at all, by word of mouth. In addition, the Commission found no documentation chronicling the measures actually taken in instances in which articles were reported missing. In the Commission's opinion, cost-effective measures could have been instituted by BG&E to ensure that employees were aware of the policy and to verify that appropriate procedures were followed when articles were reported missing. The Commission's order clearly indicates that BG&E was not denied recovery of 25% of its replacement power costs merely because the outage was caused by human error; indeed, the Commission emphasized that "an outage occasioned by human error is not a *per se* violation of this statutory standard." Rather, BG&E was denied full recovery because it had failed to implement cost-effective procedures that might have prevented such an outage.

In Cases T and U, the Commission determined that the outage in question was caused by a mechanic's failure to install a dummy plug in a condenser tube sheet after having removed a leaking condenser tube from the sheet for metal-

lurgical examination. Because the plug was not installed, salt water from the Chesapeake Bay entered the condenser through the tube sheet and contaminated the reactor's secondary cooling system. The Commission further found that the contamination was worsened and the subsequent outage lengthened because BG&E had too few chemistry personnel on duty during the maintenance procedure, thereby delaying detection of the leak, and because BG&E had failed to train adequately its chemistry and operations personnel regarding the proper procedure for detection and control of gross salt water leakage.

In its order, the Commission concluded that,

"in light of the importance of the proper insertion of dummy condenser tubes as a defense against cooling system contamination by bay water, and in consideration of the significant consequences which would result from an error in the performance of the maintenance activity, management should have foreseen the need for and benefit of additional control procedures."

The Commission identified several cost-effective control procedures it believed might have prevented this type of accident: "lead repairman documenting the position of tubes which were plugged as well as tubes which were pulled; conducting an inventory of the number of tubes removed and the number of plugs utilized; and/or having a quality control inspector verify the maintenance work." The Commission also found that BG&E's management should have foreseen the need for additional chemistry personnel during the maintenance procedure, and the need for more thorough training for its chemistry and operations personnel. Again, the Commission denied a portion of BG & E's recovery not merely because the accident occurred, but because BG&E had failed to implement cost-effective procedures that might have prevented the accident.

BG&E next argues that no substantial evidence was introduced that the outage reviewed in Case O would have been prevented by the precautionary measures advocated

by the Commission. Implicit in this argument is a basic misconception regarding the burden of proof in these proceedings. Section 54F(i) places the burden on the applicant to prove that it has complied with the requirements of § 54F(f). Thus, it was incumbent upon BG&E to prove that the outage was not the result of its failure to implement cost-effective precautionary measures. As we have already indicated, the record contains substantial evidence that the measures advocated by the Commission were cost-effective and might well have prevented the outage. The burden of proof was therefore upon BG&E to demonstrate that these measures would not in fact have prevented the outage, rather than upon the Commission or People's Counsel to prove the contrary.

▬▬ Finally, BG&E asserts that "[t]he failure of a utility to perceive and implement each and every conceivable maintenance control is not tantamount to imprudence or mismanagement." We agree. As the Commission indicated in its orders in these cases, it is only the failure to implement *cost-effective* controls that is tantamount to imprudence. A reasoning mind could reasonably have concluded, as did the Commission, that the precautionary measures advocated in these orders were cost-effective. We, therefore, defer to the Commission's judgment in this regard.

JUDGMENT AFFIRMED, WITH COSTS.

McAULIFFE, J., concurs in the result.

McAULIFFE, Judge.

I concur in the result only.