540 A.2d 820

**BALTIMORE GAS AND ELECTRIC COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF MARYLAND.**

No. 1092, Sept. Term, 1987.

Court of Special Appeals of Maryland.

May 5, 1988.

Roger D. Redden (Harvey J. Reed and David M. Perlman, on the brief), Baltimore, for appellant.

Bryan G. Moorhouse, Gen. Counsel (Sandra Hall–Eckroade, Asst. Gen. Counsel, on the brief for appellee, Public Service Com'n), John M. Glynn, People's Counsel (Kirsten A. Burger, Asst. People's Counsel, on the brief for appellee, People's Counsel), Baltimore, for appellee.

Argued before WILNER, ALPERT and KARWACKI, JJ.

ALPERT, Judge.

This appeal by the Baltimore Gas & Electric Company ("BG & E" or "Company") challenges Order No. 67557, dated December 2, 1986 of the Public Service Commission of Maryland ("PSC" or "Commission") which, pursuant to the Annotated Code of Maryland, art. 78 § 54F, denied recovery to BG & E of 50% of a fuel adjustment request. The Circuit Court for Calvert County, the Hon. Perry G. Bowen, Jr. presiding, affirmed the decision in an Opinion

and Order dated July 15, 1987. BG & E then noted this appeal.

The essential facts are not in dispute. On October 1, 1985, BG & E filed an application with the Commission to adjust its electric fuel rate. The application was docketed as Case No. 8520 and by Order No. 67174, dated October 3, 1985, the Commission suspended the fuel rate, subject to refund, to become effective with BG & E's November 1985 billings. Hearings were held before Chief Hearing Examiner Paul H. Harrington on November 1, December 5, and December 20, 1985. The Commission's Staff ("Staff") and the Office of the People's Counsel (OPC) noted their appearances and participated in the hearings.

People's Counsel raised an issue regarding an outage at the Calvert Cliffs No. 1 Generating Unit. A planned out of service period for repairs was extended for the two week period of August 14–28, 1985 when local overheating in the generator was noted while the unit was being returned to service. An investigation revealed that the problem was caused by two mechanic's rags, measuring approximately $16'' \times 27''$ and $14'' \times 22''$, which were blocking the flow in the generator's water cooling system, technically called the stator water cooling system. The rags were removed, and after a series of tests disclosed no performance-endangering damage, the unit was returned to service.

People's Counsel argued that BG & E should be denied recovery of replacement power costs associated with that portion of the Calvert Cliffs outage extension caused by the rags' blockage of the stator water cooling system. Specifically, OPC alleged that BG & E's failure to institute "item accountability" procedures was part of a pattern of lack of control of items in critical work areas. BG & E contended that it had instituted all reasonable, cost-effective precautionary measures, and that item accountability was inappropriate for the type of work performed on the stator water cooling system. The Commission's Staff suggested that consideration of BG & E's actions during the outage should be deferred until BG & E's next fuel rate proceeding, at

which time BG & E would be required to provide more detailed information concerning the cost/benefit analysis the Commission must perform in such cases. .

On January 29, 1986, the Chief Hearing Examiner issued a Proposed Order in which he disposed of other issues not relevant to this appeal and retained jurisdiction over the Calvert Cliffs Unit No. 1 planned outage extension issue. No party appealed the Proposed Order, which became final by operation of law on March 1, 1986.

On March 3, 1986, the Company filed another application for a fuel rate change with the Commission. The Commission docketed that application as Case No. 8520-A. The unresolved planned outage extension issue was consolidated with the other matters to be heard in Case No. 8520-A. A second round of hearings was held on April 10, May 12, and May 27, 1986 before Chief Hearing Examiner Harrington.

Staff, as well as People's Counsel, now argued that the Company should be denied recovery of the replacement power costs associated with the extension of the planned outage caused by obstruction of the stator water cooling system. They alleged management imprudence in the failure to implement an item accountability procedure at certain times and on certain portions of the stator water cooling system. BG & E reiterated its basic position that the Company was correct in not implementing item accountability on the entire or any part of the stator water cooling system.

On July 10, 1986, the Hearing Examiner issued a Proposed Order in the consolidated proceedings rejecting Staff's and People's Counsel's contentions concerning item accountability and finding that BG & E had maintained the productive capacity of Calvert Cliffs Unit No. 1 at a reasonable level during the period under review in Case No. 8520.

On August 11, 1986, Staff and People's Counsel noted appeals to the Commission, and on December 2, 1986, the Commission issued Order No. 67557. The Commission reit-

erated its belief, as stated in former cases, that "it is axiomatic that no business can operate without the occurrence of human error." Based upon the circumstances of the error in question, however, and more particularly the size and bulkiness of the two rags involved, the Commission did not view this incident as unavoidable human error. Rather, the Commission found "the workers' carelessness so great as to call into question the Company's procedures for instilling appropriate awareness, alertness and diligence among employees to prevent the inadvertent inclusion of foreign objects in critical and sensitive generating equipment." Therefore, the Commission ordered BG & E to bear 50% of the replacement cost incurred as a result of the outage extension. The order of December 2 is the subject of this appeal.

Appellant BG & E raises four arguments for our consideration:

I. The Commission's decision conflicts with its own standard for making Section 54F(f)(4) productive capacity determinations and, therefore, is arbitrary and capricious.

II. The record does not contain substantial evidence to support a finding that the company failed to instill sufficient awareness, alertness and diligence among its employees to prevent the inadvertent inclusion of foreign objects into critical and sensitive generating equipment.

III. The Commission's decision in Order No. 67557 exceeds its statutory authority.

IV. The opinion of the circuit court does not provide any reasons to affirm the Commission's decision in Order No. 67557.

For reasons stated *infra*, we shall remand without affirmance or reversal. Md. Rule 1071.

## I. Article 78, § 54F(f)(4) [1]

In this first assignment of error, BG & E argues that the Commission instituted a new *per se* rule for making § 54F determinations. BG & E contends that inasmuch as the Commission found that BG & E's decision not to implement item accountability did not amount to imprudent management, the Commission's imposition of 50% of the replacement costs on BG & E was arbitrary and capricious. The Commission and People's Counsel, of course, argue that the Commission's decision was consistent with its well-established interpretation of § 54F(f)(4).

The Public Service Commission Law provides, in pertinent part:

### § 54F. Fuel rate adjustments of electric companies.

. . . . .

(f) The issues to be determined, and upon which the Commission shall make specific findings of fact and conclusions based thereon, shall be whether:

(1) Only changes in the actual costs of the components of the fuel rate are included in the proposed change;

(2) The applicant has used the most economical mix of all types of generation and purchase;

(3) The applicant has made every reasonable effort to minimize fuel costs and followed competitive procurement practices, taking into account the reliability of local transportation;

(4) *The applicant has maintained the productive capacity of all its generating plants at a reasonable level.*

(g) The Commission may disallow such increased costs as it finds were a result of the applicant's failure to comply with the requirements of this section, unless cause be shown to the contrary.

. . . . .

1. Unless otherwise indicated, all statutory citations in this opinion refer to Article 78 of the Annotated Code of Maryland, Public Service Commission Law.

(i) The applicant shall have the burden of proving that it has complied with the requirements of this section.

Md.Ann.Code art. 78, § 54F (1980 & Supp.1987) (emphasis added). The standard by which the Commission implements § 54F was reviewed in *Baltimore Gas & Elec. Co. v. Public Serv. Comm'n*, 305 Md. 145, 501 A.2d 1307 (1986) (*"BG & E v. PSC"*). That case consolidated the appeal by BG & E of three fuel rate adjustment cases. In each of the three cases, the Commission concluded that BG & E had satisfied the requirements of § 54F(f)(1)–(3) but had failed to prove that it had "maintained the productive capacity of all its generating plants at a reasonable level" as required by § 54F(f)(4). *Id.* at 158–59, 501 A.2d 1307. Therefore, although the Commission found that "BG & E had achieved an excellent overall record in maintaining the output of its nuclear units," the Commission permitted BG & E recovery of only 75% of the replacement costs occasioned by an outage in Case No. 7238–O, and only 25% in Case Nos. 7238–T and 7238–U. The Court of Appeals upheld these orders.

Case No. 7238–O, *Re Baltimore Gas & Elec. Co.*, 73 Md. PSC 719 (1982), is somewhat analogous to the case at bar. In that case, a planned maintenance outage at Calvert Cliffs Unit No. 1 was extended for 17 days. This extension was caused by a standard one-half inch nut found under the turbine shaft. According to BG & E, the nut probably fell off the hoisting equipment during the planned outage and lodged under the turbine shaft where it could not be seen during the inspection of the assembly. This caused high thrust bearing temperatures and required the turbine to be taken out of service.

After hearings on BG & E's application for an adjustment in its fuel rate charges, the Commission concluded:

[W]e find that the Company has not shown that its control procedures were, in all respects, reasonable and appropriate for preventing the outage in this case. However, the evidence also indicates that this is not a case where feasible cost effective supplemental procedures

would have clearly prevented the outage which occurred. In addition, direct evidence has been presented which indicates that the plant's overall performance greatly exceeds the capacity factor of other nuclear generating units. Upon weighing these determinations, the Commission finds that management bears some responsibility for the outage and that a portion of the cost of the outage should be borne by the Company.

73 Md. PSC at 725.

In affirming the Commission's Orders, the Court of Appeals rejected BG & E's argument that the Commission's acknowledgment that the overall performance of the nuclear unit was outstanding compared to industry averages compelled a finding that the productive capacity was reasonable as a matter of law. Chief Judge Murphy, writing for the Court, explained:

> "Reasonable level" is a vague term, and its presence in an administrative statute such as the Public Service Commission Law suggests that the General Assembly intended to entrust the formulation of specific standards to the technical expertise of those charged with enforcing the statute.

305 Md. at 159, 501 A.2d 1307 (citations omitted). The Court then quoted with approval from the Commission's own summary of the procedure through which it implements § 54F(f)(4), reading in part:

> [I]f the actual performance falls below the higher of the two standards [that measure the plant's performance] or if evidence indicates that a specific outage or series of outages may be the result of imprudent management, the Commission will review the facts and circumstances surrounding the specific outages at the generating plant in question. In reviewing the factual circumstances associated with a particular outage, the Commission recognizes that forced outages cannot be completely eliminated or controlled....

> ... Therefore, an outage occasioned by human error is not a *per se* violation of this statutory standard. How-

ever, a decision must be made by the Commission as to whether the facts and decisions associated with the incident constituted mismanagement. In making this determination, *the Commission will examine the extent to which the increased costs for replacement generation could have been avoided through better planning, preventive maintenance, more diligent efforts, closer supervision, and more prudent management.* Specifically, in reviewing a particular outage, the Commission will examine whether the Company had instituted reasonable and appropriate procedures to prevent human error or equipment failure and to minimize the consequences of those occurrences.

*Id.* at 160–61, 501 A.2d 1307 (quoting *Re Baltimore Gas & Elec. Co.,* 73 MD PSC 719 (1982)). The Court concluded that the Commission's orders in the consolidated cases were consistent with the Commission's past practice. The Court stated that "the interpretation of § 54F(f)(4) applied by the Commission in the present case is entitled to considerable weight as a contemporaneous agency interpretation consistently adhered to for four years." *Id.* at 165, 501 A.2d 1307.

In the Order at bar, the Commission likewise restated its long-standing policy of requiring more stringent and detailed maintenance practices at nuclear plants than at other generating units because of the high cost consequences of outages at these plants. *See Re Baltimore Gas & Elec. Co.,* 73 MD PSC 719, 723 (1982); *Re Baltimore Gas & Elec. Co.,* 72 MD PSC 336, 342 (1981). The Commission acknowledged that employee error is inevitable and a fact of business life, and that "a small increment of operating costs will be incurred because employees, in contravention of every safeguard devised by management, make errors." Therefore, the Commission will also inquire into the company's implementation of precautionary practices. An electric company generally will be permitted to recover the replacement power costs associated with an outage "if the company has instituted prudent management systems and practices to prevent workers' errors and to minimize the cost

consequences of any errors." It is in this regard that BG & E was found deficient.

The PSC order states:

[W]e find the worker's, or workers', errors at BG & E's nuclear plant in the instant case to be inexcusable. First, a worker or workers left two sizable rags—one measuring 16 inches by 27 inches and the other measuring 14 inches by 22 inches—in or on equipment associated with the generator's cooling water system. Second, these two sizable rags were not subsequently detected by the worker, a co-worker, or any of the other personnel whose role is to double-check or inspect the on-going maintenance activities. We find that the testimony offered by the Company does not account satisfactorily for such glaring human error at a base load generating unit....

[T]he worker's carelessness is so great as to call into question the Company's procedures for instilling appropriate awareness, alertness and diligence among employees to prevent the inadvertent inclusion of foreign objects in critical and sensitive generating equipment. While we, therefore, do not fault the Company's management judgment not to institute the item accountability procedure for the work in question, and also note the Company's precautionary procedures as outlined by the Hearing Examiner, we nevertheless conclude that BG & E should bear part of the liability for the replacement power costs arising from the outage extension.

At first blush the principles reiterated and relied upon in *BG & E v. PSC* appear to compel affirmance of the Commission's order. We note, however, a significant distinction between *BG & E v. PSC* and the case at bar. Although the Commission in the case *sub judice* found that "the worker's carelessness was so great as to call into question the company's procedures for instilling appropriate awareness, alertness and diligence upon employees to prevent the inadvertent inclusion of foreign objects in critical and sensitive generating equipment," it did not articulate

the basis for those findings.[2] Thus, it may be that the Commission as factfinder arrived at its conclusion by way of inference—an administrative law application of the common law doctrine of *res ipsa loquitor*. Recognizing that the Commission's findings may include inferences which can be reasonably drawn from the facts, *Bulluck v. Pelham Woods Apts.*, 283 Md. 505, 515 (1978), we believe that the findings must at least be sufficiently detailed to apprise the parties as to the basis for the agency's decision. We subscribe to the theory that:

> [T]here are three principal reasons for the findings' requirement. The most obvious today is the overriding

---

**2.** In contrast, *see BG & E v. PSC*, 305 Md. 145, 501 A.2d 1307 (1986):

> In case O, ... BG & E offered testimony that it has a policy of requiring its employees to notify a supervisor if they are unable to account for a tool or piece of equipment that may have been lost in the vicinity of a critical maintenance project. BG & E also indicated that, to encourage compliance with this policy, it takes no disciplinary action against employees who report missing tools or equipment.
>
> While endorsing this policy, the Commission concluded that it had been poorly implemented. The policy was apparently never written down; employees learned of it, if at all, by word of mouth. In addition, the Commission found no documentation chronicling the measures actually taken in instances in which articles were reported missing. In the Commission's opinion, cost-effective measures could have been instituted by BG & E to ensure that employees were aware of the policy and to verify that appropriate procedures were followed when articles were reported missing....
>
> In cases T and U ... the Commission identified several cost-effective control procedures it believed might have prevented this type of accident: "lead repairman documenting the position of tubes which were plugged as well as tubes which were pulled; conducting an inventory of the number of tubes removed and the number of plugs utilized; and/or having a quality control inspector verify the maintenance work." The Commission also found that BG & E's management should have foreseen the need for additional chemistry personnel during the maintenance procedure, and the need for more thorough training for its chemistry and operations personnel.

*Id.* at 172–73, 501 A.2d 1307.

In an earlier appeal, this court similarly found:

> In each case ... the People's Counsel presented evidence that particular forced outages could have been avoided by reasonable and prudent management designed to prevent employee error.

policy against government operating in secret.... Requiring articulation of the reasoning process evokes care on the part of the decider: "to set in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty: Often a strong impression of that, on the basis of the evidence, the facts are thus and so, gives way when it comes to expressing that impression on paper."

In the second place, a losing party has the right to know why he lost his case. The requirement of findings meets the elementary demand of those injured by an agency decision to be told "the reason why." Findings serve as an explanation to the parties as to the basis for the decision. Thirdly and the reason most frequently emphasized, is the role of the findings requirement in facilitating judicial review....

Findings are of two kinds: basic and ultimate.... The facts referred to are usually called "basic" facts, the conclusions "ultimate" facts. The distinction was explained in a federal case as follows: (1) from consideration of the evidence, a determination of facts of a basic or underlying nature must be reached; (2) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred....

It is not enough for an agency to make only ultimate findings.

B. Schwartz, *Administrative Law*, § 140 (1976) (footnotes omitted). *See* 3 K. Davis, *Administrative Law Treatise*, § 14:21 at 102 (2d ed. 1980), "[a] reviewing court cannot understand the agency's action unless findings and reasons are stated; ... a statement of findings and reasons is usually an effective protection against arbitrariness.". *See also Ocean Hideaway Condo. Assoc. v. Boardwalk Plaza Venture*, 68 Md.App. 650, 656, 515 A.2d 485 (1986). It is not our responsibility to search the record before the Com-

mission to determine if there exists evidence to support its conclusions. As Judge Lawrence F. Rodowsky so aptly stated for the Court of Appeals in *United Steelworkers v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984):

Judicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.

The legislature has vested the Public Service Commission with powers that are truly awesome:

The Commission shall supervise and regulate all public service companies subject to its jurisdiction to assure their operation in the interest of the public and to promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality. To these ends, the Commission shall enforce compliance by such companies with all the requirements of law, including, but not limited to requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates, and service. The powers and duties enumerated specifically in this subtitle are not intended to limit the scope of the general powers and duties of the Commission provided for by this article.

Md.Ann.Code art. 78, § 56 (1980).

To implement those powers, "[t]he Commission shall institute and conduct any proceedings reasonably necessary and proper to the exercise of any of its powers, or the performance of any of its duties." Art. 78, § 62(a). Concomitantly,

the Commission, in executing those powers, is charged with certain responsibilities when acting in a quasi-judicial capacity. Among them are (1) the duty to "make specific findings of fact and conclusions based thereon" in determining whether the applicant in a rate adjustment proceeding "has maintained the productive capacity of all its generating plants at a reasonable level." Art. 78, § 54F(f)(4); and (2) the duty to state the grounds for its conclusions in every decision and order in any contested proceeding. Art. 78, § 85(a). In *BG & E, supra,* it is clear that Chief Judge Murphy's analysis was based upon the Commission's findings and not on any independent review of the proceedings before the Commission.

In the case *sub judice* the Commission failed to articulate the reason for its conclusion that the worker's carelessness was so great as to indicate "managerial imprudence." If, in fact, the record was insufficient to establish "the company's procedures for instilling appropriate awareness, alertness and diligence" so as to prevent the cause of the subject outage, then the Commission should have so stated with particularity. It should have delineated those facts which amounted to imprudent management. But this shortcoming does not require automatic reversal. Rather, we believe "that the substantial merits of [this] case will not be determined by affirming, reversing or modifying the judgment from which the appeal was taken, [but] that the purposes of justice will be advanced by permitting further proceedings in the cause." Md. Rule 1071(a). These proceedings may entail either further factfinding on the part of the Commission or the introduction of additional evidence, or both. Accordingly, we shall remand for further proceedings pursuant to Rule 1071(a).

## II. Sufficiency of the Evidence

Next, BG & E attacks the sufficiency of the evidence supporting the Commission's Order which "call[ed] into question the Company's procedures for instilling appropriate awareness, alertness and diligence among employees to

prevent the inadvertent inclusions of foreign objects in critical and sensitive generating equipment." BG & E argues that "the evidence, both of the specific actions taken during the time relevant to this case and of Company policies in general is *uncontroverted.*" (Emphasis in original).

It is well settled that "Commission orders enjoy a high degree of judicial deference on review." *BG & E v. PSC,* 305 Md. at 170, 501 A.2d 1307. *See* Code § 97. As Chief Judge Murphy explained for the Court,

> Recognizing the experience and special expertise of the Commission and its staff, a reviewing court must not substitute its judgment for that of the Commission.... Indeed, a reviewing court must uphold the Commission order on appeal unless the party challenging the order demonstrates by clear and satisfactory evidence that the order is unlawful or unreasonable.

*BG & E v. PSC,* 305 Md. at 170–71, 501 A.2d 1307 (citations omitted).

The scope of our review is set forth in § 97 of the Public Service Commission Law. Our inquiry must focus on "the agency's fact-finding results and [must not constitute] an independent original estimate of or decision on the evidence.... [J]udicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *BG & E v. PSC,* 305 Md. at 171, 501 A.2d 1307 (citing *Insurance Comm'r v. National Bureau,* 203 Md. 79, 84, 98 A.2d 15 (1953)). Because we cannot determine the basis of the Commission's finding of "ultimate" fact, we likewise cannot determine whether the evidence was sufficient to support that conclusion.

### III. BG & E's Burden of Proof

BG & E contends that because the focus of the hearings was on whether item accountability should have been adopted, the Commission's adoption of a new *per se* rule deprived BG & E of the opportunity to show cause why full

recovery should be allowed. *See* § 54F(g), "The Commission may disallow such increased costs as it finds were a result of the applicant's failure to comply with the requirements of this section, unless cause be shown to the contrary."

In light of our determination in part I, *supra,* we need not address this contention. For the same reason, appellant's fourth argument need not be reached.

CASE REMANDED PURSUANT TO MARYLAND RULE 1071(a) FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.