906 A.2d 388

CITY NEIGHBORS CHARTER SCHOOL, et al.

v.

BALTIMORE CITY BOARD OF SCHOOL
COMMISSIONERS, et al.

No. 1598 Sept. Term, 2005.

Court of Special Appeals of Maryland.

Aug. 31, 2006.

610

Richard C. Daniels, College Park, MD and F.W. Dubois, Baltimore, MD (Walter W. Green, Lani L. Daniels, on the brief, College Park, MD) (Paul A. Fenn, Gregory T. Lawrence, Sedica Sawez, on the brief, Baltimore, MD), for Appellants.

Warren N. Weaver and Keith J. Zimmerman, Baltimore, MD (Joel A. Smith, Jeffrey M. Ross, Valerie V. Cloutier, Frank C. Derr, Elizabeth Kameen, Megan K. Mechak, Sally A. Robinson, Ilana Subar, Anthony J. Trotta and Brian Williams, on the brief, Baltimore, MD) (John R. Costello, on the brief, Towson, MD), for Appellees.

Panel: MURPHY, C.J., DEBORAH S. EYLER, and ADKINS, JJ.

ADKINS, Judge.

This appeal raises questions about the amount and type of funding that the Baltimore City Board of School Commissioners (the City Board), appellee and cross-appellant, is obligated to provide to public charter schools under the 2003 Maryland Public Charter School Act (the Act), Md.Code (1978, 2004 Repl. Vol., 2005 Cum. Supp.), § 9–101 et seq. of the Education Article (Educ.). Specifically, what does the statute mean when it requires that the City Board provide public charter schools with funding that is "commensurate with the amount disbursed to other public schools in the local jurisdiction"? *See* Educ. § 9–109(a). And can the City Board satisfy its obligation to "disburse" such funds by providing in-kind services in lieu of money? *See id.* We are also asked to decide whether the Maryland State Board of Education (the State

Board) has authority to grant waivers that allow public charter schools to employ teachers and staff on terms other than those set by collective bargaining agreements.

## Charter School Funding Law

The Md. Public School Charter Act of 2003, Educ.Code section 9–101 (2003 Md. Laws, ch. 358), establishes Maryland's public charter school program and its purpose:

(b) The general purpose of the Program is to establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students.

Section 9–104 of the Act spells out the application procedures for establishing a public charter school:

(a)(1) An application to establish a public charter school shall be submitted to the county board of the county in which the charter school will be located. . . .

(4)(i) Except as provided in subparagraph (ii) of this paragraph, the county board shall review the application and render a decision within 120 days of receipt of the application. . . .

(2) The State Board shall render a decision within 120 days of the filing of an appeal under this subsection.

(3) If the county board denies an application to establish a public charter school and the State Board reverses the decision, the State Board may direct the county board to grant a charter and shall mediate with the county board and the applicant to implement the charter.

At the heart of this dispute lie the funding provisions of the Act, codified at Educ.Code section 9–109, which requires City and county boards of education to

**disburse** to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is **commensurate with the amount disbursed to other public schools in the local jurisdiction.** (Emphasis added.)

### The Funding Disputes

The City Board "conditionally granted" public school charters to both City Neighbors Charter School (City Neighbors) [1] and Patterson Park Public Charter School (Patterson Park),[2] appellants and cross-appellees (collectively, the Charter Schools), for three school years beginning in 2005–06. In doing so, it declined to fund the per pupil budgets proposed in their respective applications. Instead, the City Board required that there be a subsequent agreement regarding funding.

By November 2004, the City Board had approved a September 2005 opening date for both schools. But by February 2005, the City Board still had not made a funding commitment to either of these charter schools or any other.

The Charter Schools viewed this as a *de facto* denial of their applications. They separately complained to the State Board, contending that the City Board disregarded the statutory requirement that it render a decision on their applications within 120 days. Moreover, the Charter Schools asserted, the City Board failed to perform its statutory duty to "disburse" funds in an amount "commensurate" with other local public schools.

City Neighbors asked the State Board to resolve these disputes via a declaratory ruling "as to the interpretation of § 9–109(a) of the Education Article." Patterson Park noted a separate "appeal from the denial of its Application," asking for approval and a funding level of $7,500 per pupil "plus Federal grant entitlement and special education funds[.]" On February 11, the State Board notified the parties that "oral argument" would be held in both cases on April 19.

---

**1.** City Neighbors submitted the first application to open a charter school in Baltimore City, on March 15, 2004. The funding proposal in that application was $4,200 per pupil.

**2.** Patterson Park submitted its application on August 31, 2004, requesting a per pupil allotment of $7,500.

The City Board moved to dismiss Patterson Park's appeal, asserting that the State Board did not have jurisdiction under section 9–104(b)(1) because Patterson Park's application had been granted. The City Board asked the State Board to "hear oral arguments on the Motion to Dismiss in advance of any evidentiary hearing."

On March 8, 2005, the City Board issued a memorandum announcing to all approved charter school applicants that per pupil funding for the 2006 school year would be $5,011 in cash and $2,943 in services.

The City Board then moved to dismiss City Neighbors' petition on the ground that this funding commitment mooted the action. In addition, the City Board argued that the State Board lacked jurisdiction to decide "pure questions of law" such as the meaning of section 9–109, that City Neighbors' petition was "not timely," and that City Neighbors failed to overcome the presumption that the City Board's funding model was "correct." It again requested that the State Board hear oral argument before "any evidentiary hearing."

The Charter Schools objected to the City Board's funding proposal, and opposed its motions to dismiss. Specifically, they complained that the cash funding was inadequate, that the services to be provided were not services they require or desire, and that section 9–109 requires funding to be disbursed as cash rather than services. In addition, they asserted, the City instructed applicants to include pre-kindergarten for at-risk children in their applications in March 2004, but then informed applicants in February 2005 that it would not fund pre-kindergarten programs for charter schools.

At the April 19 hearings, the City Board and the Charter Schools argued the merits of their respective petitions. Counsel for the City Board advised that, due to a funding increase to the school system, the funding offer for both City Neighbors and Patterson Park would be increased to $8,108 per pupil for fiscal year 2006, including services.

On May 6, 2005, the State Board issued decisions in both cases, which it subsequently revised on May 26. These deci-

sions made the Charter Schools happy and the City Board unhappy. Specifically, the State Board:

- set a specific dollar per student funding amount at $10,956, based on a "funding template" reflecting "the 2004–05 approved system operating budget and the 2004 enrollment count," as well as a two percent reduction to adjust for "central office functions" provided to the charter schools by the City school system;

- disapproved the City Board's proposal to "disburse" funding through the provision of in-kind services rather than money;

- directed the Charter Schools to file a separate request for waivers of collective bargaining rights enjoyed by Union members, including a requirement that the City appoint teachers, principals, and other school officials; and

- directed that, in light of "the 120 day statutory deadline for a local board decision on a charter school application[,]" charter agreements "must be completed within 30 calendar days from the date of the decision approving the charter application," but that delay and urgency in this instance required completion of these two charter agreements "within 15 business days of the date of issuance of this revised opinion."

The State Board stated that it "issued this Opinion as guidance and direction not only to the parties in this appeal but also to the charter school applicants and local systems in Maryland[.]"

Despite the deadline imposed by the State Board, the imminency of the initial 2005–06 school year approved by the City Board prompted a compromise that resulted in a funding agreement to cover the 2005–06 school year only. In a short-term Charter Agreement dated June 21, 2005, both City Neighbors and Patterson Park agreed to accept a "total School Fund Allocation" "for a one-year period" only, while "preserv[ing] all right to seek resolution of the issue of commensurate funding (as defined by § 9–109 . . .) in litigation, including agency proceedings[.]" In addition, the City

Board explicitly "agree[d] that this Charter Agreement does not resolve the disputed issue of commensurate funding[.]"

On judicial review,[3] the Circuit Court for Baltimore City held that the challenge to the State Board's funding decision is moot. The court therefore refused to vacate the State Board decision regarding funding. In addition, the circuit court held that the State Board erred in ruling that the collective bargaining rights of public charter school employees can be waived, and therefore the court vacated that aspect of the State Board's decision.[4]

## Issues On Appeal And Cross–Appeal

The Charter Schools and the City Board challenge the circuit court's decision on myriad grounds. We restate and reorder the issues as presented by the Charter School's appeal and the City Board's cross-appeal, as follows:

I. Did the circuit court err in concluding that appellants' judicial review petition is moot? (Raised on appeal by the Charter Schools and on cross-appeal by the City Board.)

II. Should the State Board's opinion regarding funding be affirmed or vacated? (Appeal by both Charter Schools, cross-appeal by City Board.) This is the primary issue in this appeal.

III. Did the circuit court err in deciding the issue of whether the State Board has authority to grant waiv-

---

**3.** Like City Neighbors and Patterson Park, KIPP Ujima Academy (KIPP) and Baltimore Southwest Charter School (Southwest), also appellants and cross-appellees, applied to the City Board for approval and funding to operate public charter schools in the Baltimore City school district. These two schools intervened in the judicial review action. KIPP is designed for 300 students in grades five through eight. Southwest is structured to serve children in pre-kindergarten through eighth grade.

**4.** The Baltimore Teachers Union, American Federation of Teachers Local 340, AFL–CIO (the BTU) and the Baltimore City Municipal Employees Union, American Federation of State, County and Municipal Employees, Council 67, Local 44 (AFSCME), are appellees before this Court.

ers of employee status requirements of Educ. section 9–108? (Appeal by Patterson Park.)

We shall hold that the commensurate funding dispute is not moot (issue I), but that the waiver dispute should not have been decided in this action (issue III). Proceeding to review the State Board's decision on the merits, we shall affirm it (issue II).

## DISCUSSION

### I.

### Charter Schools' Appeals And City Board's Cross–Appeal: Mootness

■ "The test of mootness is whether, when it is before the court, a case presents a controversy between the parties for which, by way of resolution, the court can fashion an effective remedy." *Adkins v. State*, 324 Md. 641, 646, 598 A.2d 194 (1991). The Charter Schools and the City Board contend there is a live controversy regarding funding for the 2006–07 and 2007–08 school years, both of which were conditionally approved by the City Board subject to resolution of the funding issues raised in this appeal. We agree.

■ The circuit court erred when it held the controversy regarding Educ. section 9–109 is moot, because there is a continuing dispute over the proper interpretation of that statute and its application to these Charter Schools. Indeed, the City Board and the Charter Schools recognized this by explicitly reserving the right to litigate these questions in their temporary Charter Agreement funding only the 2005–06 school year. Because there are unresolved disputes over funding for the 2006–07 and 2007–08 school years, there is "live controversy" that is amenable to judicial review and resolution.

The primary issue before the circuit court was whether the State Board's decision should be affirmed or vacated. That same question is presented by both the Charter Schools' appeals to this Court, as well as the City Board's cross-appeal.

We may address the merits of these issues because our task is to perform the same review of the State Board's decision that the circuit court should have performed. *See New Bd. of Sch. Comm'rs of Baltimore City v. Public School Admin'rs and Supervisors Ass'n of Baltimore City,* 142 Md.App. 61, 70, 788 A.2d 200 (2002).

Our resolution of those questions is likely to have an immediate impact on funding for the school year that begins in the fall 2006. It will directly affect City Neighbors and Patterson Park, and indirectly affect other similarly situated public charter schools that are awaiting resolution of legal issues raised here. Specifically, the questions relating to how "commensurate" funding is determined, and whether local school boards may elect to "disburse" such funds by providing in-kind services, have potentially broad application to Maryland public charter schools. We therefore proceed to review the State Board decision on the merits.

## II.

## Charter Schools' Appeals And City Board's Cross–Appeal: Review Of The State Board's Decision

### A.

### Standard Of Review

The disputes between the Charter Schools and the City Board begin with a threshold debate over the appropriate standard of judicial review. According to the Charter Schools, courts must give "special deference" to the State Board's interpretation of state education law, because Educ. section 2–205(e) broadly authorizes the State Board to interpret education law and policy, and to resolve controversies arising from the application of those laws:

(e) *Explanation of law; controversies and disputes.*—(1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:

(i) This article that are within its jurisdiction; and

. . .

(2) The Board shall decide all controversies and disputes under these provisions.

(3) The decision of the Board is final.

*See also* COMAR 13A.01.05.05.E ("The State Board shall exercise its independent judgment on the record before it in the explanation and interpretation of the public school laws").

The City Board disagrees that deference is due to the State Board. To the contrary, it argues, the State Board must defer to the City Board on funding issues for local charter schools. In support, the City Board cites COMAR 13A.01.05.05.A, which provides that "[d]ecisions of a local board involving a local policy . . . shall be considered prima facie correct, and the State Board may not substitute its judgment for that of the local board unless the decision is arbitrary, unreasonable, or illegal." The City Board points out that the General Assembly did not define "commensurate" or "disburse," nor did it establish a funding formula or other procedures for determining what is commensurate. In its view, this legislative silence means that these are matters left to the expertise of local school boards.

■ The State Board has "a visitatorial power of such comprehensive character as to invest [it] with the last word on any matter concerning education policy or the administration of the system of public education[.]" *Arroyo v. Bd. of Educ. of Howard County,* 381 Md. 646, 664, 851 A.2d 576 (2004). Educ. section 2–205(e) codifies this principle:

(e)(1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:

(i) This article that are within its jurisdiction; and

(ii) The bylaws, rules, and regulations adopted by the Board.

(2) The Board shall decide all controversies and disputes under these provisions.

(3) The decision of the Board is final.

"[A]ppeals concerning the intent and meaning of a provision of the Education Article . . . are taken from the [local] boards to the State Board." *Hurl v. Bd. of Educ. of Howard County*, 107 Md.App. 286, 299, 667 A.2d 970 (1995); *see Bd. of Educ. for Dorchester County v. Hubbard*, 305 Md. 774, 789, 506 A.2d 625 (1986). Thus, the State Board's "paramount role . . . in interpreting the public education law" is one that "sets it apart from most administrative agencies." *Hubbard*, 305 Md. at 791, 506 A.2d 625.

We conclude that interpreting the section 9–109 requirement that "commensurate funding" be "disburse[d]" to the Charter Schools is not a matter of local policy on which the State Board must defer to the City Board. Questions regarding the meaning of education statutes invoke the comprehensive authority of the State Board. Explaining the meaning of "commensurate" and "disburse" requires construction of the state education law, which falls within the broad mandate given to the State Board under Educ. section 2–205(e) and COMAR 13A.01.05.05.E. The paramount role played by the State Board in interpreting this statutory language prevents Maryland's Charter School Act from taking on a different meaning in each of Maryland's local school districts.

For that reason, we hold that the State Board is not required to treat the City Board's interpretation of section 9–109 as *prima facie* correct. The State Board acted appropriately in "exercising its independent judgment on the record before it in the explanation and interpretation of the public school laws" governing the Charter Schools' applications.

Moreover, we also recognize that the State Board had authority to overrule the City Board's funding decision. After the City Board determined the amount of funding that it considered "commensurate with other local public schools," the State Board exercised its broad authority to review that decision, and to "correct all abuses of authority and to nullify all irregular proceedings." *Zeitschel v. Bd. of Educ. of Carroll County*, 274 Md. 69, 81, 332 A.2d 906 (1975).

Here, the State Board held that the City Board must allocate funds in an amount it determined to be "equal to" the per pupil expenditures made for students in other City public schools, taking into account certain specified income and expenses. In doing so, the State Board created a "funding template" that it used to determine the amount of funds that the City Board was obligated to disburse to City Neighbors and Patterson Park. In addition, it held that the City Board may not "disburse" funds as in-kind services rather than money.

■ Our review of the State Board's decision is limited to four questions: (1) whether it rests on error concerning a purely legal question; (2) whether the State Board violated a state statute; (3) whether the State Board exercised its power in bad faith, fraudulently, or in breach of trust; and (4) whether the State Board exercised its power arbitrarily or capriciously. *See Hurl,* 107 Md.App. at 299, 667 A.2d 970; *New Bd. of Sch. Comm'rs of Baltimore City,* 142 Md.App. at 78, 788 A.2d 200.

## B.

### Charter Schools' Appeals: Improper Rulemaking

■ The State Board issued its revised opinion "as guidance and direction not only to the parties in this appeal but also to the other charter school applicants and local school systems in Maryland[.]" Citing this statement, the circuit court characterized the State Board's decision as a sweeping rule with the force of a regulation.[5]

The Charter Schools argue that the circuit court erred in concluding that the State Board's decision constituted improper rulemaking. We agree.

---

5. In dictum, the circuit court interpreted the State Board's decision as establishing a "formula for computing per pupil expenditures" that "applied ... on a statewide basis." The circuit court held that the State Board erred by imposing such far-reaching rules without soliciting the opinions of "interested persons, including parents, children, individual teachers, the unions and legislators."

As we have discussed, the State Board is statutorily required to interpret and explain education statutes, including the public charter school provisions of sections 9–104 and 9–109. *See* Educ. § 2–205(e). It may do so in response to a petition for declaratory ruling. The Court of Appeals long ago recognized the "well settled principle of administrative law that 'the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.'" *BG & E v. Pub. Serv. Comm'n of Md.*, 305 Md. 145, 168, 501 A.2d 1307 (1986). As the Court explained,

> "[t]he function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.... Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity."

*Id.* at 169, 501 A.2d 1307 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)); *see generally* 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.9 (2002).

Thus, it is entirely proper for a party to a dispute arising from conflicting interpretations of the Education Article to petition the State Board for a declaratory ruling, or to appeal a local school decision to the State Board, and for the State Board to construe and explain the law in the course of deciding such matters. *See* Md.Code (1984, 2004 Repl. Vol., 2005 Cum. Supp.), § 10–304 of the State Government Article (SG); COMAR 13A.01.05.02. There is ample precedent for

articulating standards that may apply in other cases via administrative adjudication rather than rulemaking. In *BG & E v. Public Serv. Comm'n*, 305 Md. at 168, 501 A.2d 1307, for example, the Court of Appeals affirmed that an agency may interpret and apply controlling statutes while deciding a contested case, particularly when it "did not abstractly formulate new rules of binding and universal future effect, but simply articulated the standards through which it interpreted and implemented [the statute] during the course of specific contested proceedings, as it was required to do by [statute]." *See also Delmarva Power & Light Co. v. Pub. Serv. Comm'n of Md.*, 370 Md. 1, 34–37, 803 A.2d 460 (2002)(reviewing similar cases). That is what happened here.

City Neighbors petitioned the State Board for a declaratory ruling that the City Board failed to provide per pupil funding "commensurate" with the funding to students in other Baltimore City public schools and failed to properly "disburse" such funds. Similarly, Patterson Park petitioned the State Board to declare the City Board's "conditional acceptance" of its application a *de facto* denial, and to address the same commensurate funding and disbursement questions raised by City Neighbors. Both City Neighbors and Patterson Park presented justiciable issues concerning the meaning and application of sections 9–104 and 9–109 as those statutes apply to their pending charter school applications. The State Board had authority to resolve these disputes, by "articulat[ing] the standards through which it interpreted and implemented [the statute] during the course of specific contested proceedings[.]" *See BG & E,* 305 Md. at 168, 501 A.2d 1307.

Moreover, we do not agree with the circuit court that the State Board intended its decisions on these two applications to regulate all future applications "statewide." We read the decision just as the State Board described it—mere "guidance and direction" to any "charter school applicants and local school systems in Maryland" who wish to use it "for the refinement of their working relationships[.]" The State Board acknowledged that "there is no statewide formula or methodology that determines how local school systems fund their

schools." We view the funding template as the State Board's effort to articulate a "reasonable starting point" and traceable methodology for establishing a per pupil funding benchmark.

## C.

### City Board's Cross–Appeal: Procedural Defects

The City Board complains that the State Board "committed numerous procedural errors and violated the due process rights of the City Board and others." We perceive two distinct complaints.

### 1.

### Evidentiary Hearing

■■ The City Board's first procedural grievance is that it was denied an evidentiary hearing. In requests filed with its motions to dismiss, the City Board asked the State Board to hold "oral argument" on those motions "in advance of any evidentiary hearing" on the merits of the Charter Schools' petitions. After denying the City Board's motions to dismiss at the April 19 hearing, the State Board proceeded to consider the merits of the funding dispute. The City Board complains that this deprived it of an opportunity to submit evidence responding to the merits of Patterson Park's appeal and City Neighbors' petition.

The City Board asserts that, if given that right, it would have presented evidence that created material factual disputes on the methodology and figures used to determine funding. For example, the City Board proffers that it "would have presented evidence showing that the administrative services that the [City School system] provides accounts for approximately 6% of its total operating budget." These higher central office costs might reflect, for instance, that a higher percentage of students in the City receive free and reduced lunches, requiring more central staffing for that program. According to the City Board, factual disputes on any such funding questions would have required transfer of the case to

the Office of Administrative Hearings, pursuant to COMAR 13A.01.05.07.A(3),[6] prior to the State Board's decision.

Patterson Park counters by questioning "how, as a political subdivision of the State, [the City Board] is entitled to due process from the State." *See Md. State Bd. of Educ. v. Bradford*, 387 Md. 353, 363 n. 2, 875 A.2d 703 (2005). Moreover, both Charter Schools contend that the City Board asserted that the issues were "purely legal," making an evidentiary hearing unnecessary. Finally, City Board waived any right it may have had to present such evidence.

We agree that the City Board has no grounds to complain that it was denied an opportunity to present evidence. The proceedings before the State Board were in the nature of administrative appeals, in that both City Neighbors and Patterson Park asked the State Board to provide relief from the City Board's decisions (or lack thereof). Indeed, Patterson Park specifically asked the State Board to grant its application. *Before* the City Board filed either of its motions to dismiss, it received notice that "oral argument" would be taken April 19 on the merits of the Charter Schools' claims.

The City Board cites no procedural rule that guarantees the right to engage in preliminary motions practice before the State Board, separate from and prior to the regularly scheduled hearing on the Charter Schools' appeals. We need not decide whether there is any, because we conclude that if such right exists, the City Board waived it.

Although the City Board requested that oral argument be heard on its motions to dismiss "in advance of any evidentiary hearing," it did not specifically request an earlier hearing date for its motions. Nor did it ask that the merits hearing scheduled for April 19 be postponed so that both the motions to

---

6. COMAR 13A.01.05.07.A provides in pertinent part:

A. The State Board shall transfer an appeal to the Office of Administrative Hearings for review by an administrative law judge under the following circumstances: ...

(3) An appeal upon review in which the State Board finds that there exists a genuine dispute of material fact.

dismiss and the merits hearing would not be held together. Nor did it receive from the State Board any assurances of an earlier or separate hearing on those motions. Thus, the City Board had no reason to expect that the April 19 hearing would *not* proceed to the merits as scheduled, once the City Board's motions to dismiss had been considered.

Moreover, the City Board had ample opportunity to submit evidence in support of its arguments on the funding issues raised by the Charter Schools, both before and during the April 19 hearing. The City Board knew that the Charter Schools had submitted evidence in support of their appeals and their oppositions to the City Board's motions to dismiss. At the hearing, the City Board argued the merits of the funding issues raised by both Charter Schools.[7] Moreover, the City Board did not object, or otherwise notify the State Board that it would like an additional opportunity to submit evidence. Nor did it proffer what evidence it might have submitted or request permission to submit evidence following the hearing. Nor did it ask the State Board to reconsider its decision on that ground.

In these circumstances, we have no trouble concluding that the City Board cannot complain that it was denied the right to submit evidence. The City Board appears to have assumed what neither the law nor good practice supports. There is no law or regulation guaranteeing City Board the right to delay a merits hearing before the State Board, upon the mere filing of a motion to dismiss or a request for a hearing on that motion. Moreover, the City Board did nothing to confirm its assumption. With no request for a separate hearing, no notice that there would be one, no request to present evidence, and no

---

7. For example, at the hearing on Patterson Park's appeal, counsel for the City Board addressed the merits of Patterson Park's request that "the State Board set the funding level." In doing so, counsel addressed various evidentiary questions raised by members of the State Board, explaining for instance that the preliminary inspection of the Patterson Park site raised "some issues" that were not yet resolved. Counsel also proffered that there will be "an increase in funding for fiscal year 06," raising "the City Board's offer to Patterson to $8,018 per pupil."

objection to the presentation of evidence, we are not persuaded that the City Board was deprived of its right to present evidence.

## 2.

### "Conversion" Of Patterson Park's Appeal

■ The State Board determined "that although [Patterson Park] has filed this case as an appeal of the denial of its application, we find that it is more properly handled by the State Board as a petition for declaratory ruling on the funding and employee status issues." The City Board argues that the State Board improperly converted Patterson Park's appeal "after the fact" to a petition for a declaratory ruling.

We agree that distinct regulations apply to an appeal of a local board's decision, *see* COMAR 13A.01.05.02.A, and to a petition for a declaratory ruling. *See* COMAR 13A.01.05.02.D. But as the City Board concedes, "the procedures for both types of review are the same[.]" That being the case, we reject the City Board's contention that the "substantive difference between an appeal and a petition for declaratory ruling," by itself, merits any relief. The City Board conspicuously fails to explain why it has any right to complain in these circumstances, or what prejudice it suffered. We see none.

## D.

### Charter Schools' Appeals And City Board's Cross-Appeal: Interpretation Of Section 9–109

We finally reach the heart of the dispute between the Charter Schools and the City Board—the merits of the State Board's decisions as to (1) what constitutes commensurate funding in Baltimore City and (2) how those funds may be disbursed. The Charter Schools ask us to affirm the State Board's interpretation of section 9–109, whereas the City Board asks us to vacate it. There are several points of disagreement, which we shall review *in seriatum*.

## 1.

## Duty To Disburse

Section 9–109(a) requires a local board to "disburse to a charter school the amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction." The State Board construed this duty to "disburse" as a duty to provide money rather than services. It ruled that the City Board cannot compel the Charter Schools to accept its services in lieu of funds.

The City Board challenges that conclusion, pointing out that nothing in section 9–109 requires disbursement of money, rather than services, in the same way they are provided to other public school students. For example, the categories of expenses itemized by the City Board as "disbursed to other public schools" as services rather than cash include central office expenses, fringe benefits of retirees, Risk Management Program expenses, worker's compensation and unemployment compensation expenses, building maintenance, and utilities.

The Charter Schools respond that the section 9–109 duty to "disburse" must be construed to refer to funds rather than services because "[i]nnovation would be impossible if the City School Board may compel [the Charter Schools] to use current BCPSS services[.]" In their view, "[c]ompulsory use of BCPSS services would ensure that City Neighbors could never be anything other than a system school using the BCPSS model." They contend that this interpretation of section 9–109(a), they claim, is the only one consistent with the legislative purpose and history of the Public Charter Schools Act.

In reviewing the State Board's interpretation of the statutory requirement that funds be "disbursed," we are mindful of the State Board's unique role in explaining the "true intent" and meaning of this statute. *See Hubbard*, 305 Md. at 788, 506 A.2d 625; Educ. § 2–205(e)(1). We therefore give special deference to the State Board's interpretation of the

education statutes it administers, including section 9–109. *See Montgomery County Educ. Ass'n, Inc. v. Bd. of Educ. of Montgomery County*, 311 Md. 303, 309, 534 A.2d 980 (1987); *New Bd. of Sch. Comm'rs*, 142 Md.App. at 70, 788 A.2d 200.

Like the State Board, we also follow established principles of statutory construction. Our primary goal in construing a statute is to enforce the legislature's intent. *See Martin v. Beverage Capital Corp.*, 353 Md. 388, 399, 726 A.2d 728 (1999). To discern that intent, we look first to the language of the statute, which we give its commonly understood meaning, often as it is found in a dictionary. *See Rossville Vending Mach. Corp. v. Comptroller of the Treas.*, 97 Md.App. 305, 316, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993). When the statutory language is clear and unambiguous, no clarification is needed or permitted. *See Martin,* 353 Md. at 399, 726 A.2d 728. We find the State Board's interpretation of the disbursement requirement to be consistent with both the plain meaning of the statutory language and the goal of the Maryland Public Charter Schools Act to promote innovative, independent, and creative charter schools as an alternative to traditional public schools.

■■■ Section 9–109(a) directs local boards to "disburse an amount of . . . money[.]" As the State Board observed, to "disburse" means to "pay out" or "expend, esp. from a public fund." *See Webster's Third New Int'l Dictionary* 644 (unabr. 2002). "Money" is "coinage or negotiable paper issued as legal tender," not services. *See id.* at 1458. We therefore agree with the State Board that the plain meaning of "disbursing an amount of money" is to "pay out" in cash, rather than services.

That conclusion is consistent with the purpose and history of the Act. Allowing each charter school to determine how it will allocate such money promotes the legislature's stated goal of establishing "innovative learning opportunities and creative education approaches," as alternatives to traditional public schools. *See* Educ. § 9–101(b). If the City Board could choose which of its centralized services each charter school

will have to accept, in lieu of cash disbursements, such innovation and creativity may be inhibited. Indeed, Patterson Park complains that, when the City Board announced its intent to provide nearly $3,000 per pupil in services rather than money, many of those services were ones that Patterson Park "did not need or want."

Finally, the Fiscal and Policy Note concerning the Act envisions per pupil allocations "averag[ing] $7,496 in fiscal 2001, ranging from $6,219 in Caroline County to $8,922 in Montgomery County," as well as an average per pupil expenditure of $8,800 in 2004, "ranging from $7,300 in low spending districts to $10,500 in high spending districts." This language suggests that the General Assembly planned that charter schools would be funded in "money" rather than services.

### 2.

### Per Pupil Funding

██ The Charter Schools assert that the State correctly applied the plain, dictionary meaning of "commensurate" when it held "that a charter school should receive funds proportionate to those expended for the education of similar student populations, all determined on a per pupil basis." The City Board, somewhat inexplicably, objects that there is no requirement that the funding be calculated and provided on a "per pupil" basis. We affirm the State Board's use of a per pupil funding model. Even the City Board advocated per pupil funding in its funding commitment and presentation to the State Board.

### 3.

### Commensurate Funding

The State Board construed the requirement to fund public charter schools "in an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction" as follows:

[U]nder the plain meaning rule, we believe the legislature intended that a public charter school receive federal, State, and local funding in an amount proportionate to the amount of funds expended for elementary, middle, and secondary level students in the other public schools in the same system. This includes funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, and transportation.

In order to determine the precise amount and because there is no statewide formula or methodology that determines how local school systems fund their schools, we believe that a reasonable starting point is the total annual school system operating budget that includes all federal, State, and local funding with the approved appropriations for each of the major categories specified as in § 5–101(b)(2) of the Education Article, that each local board of education submits to MSDE within 30 days of approval by the respective local government. The next step is to divide the total annual operating budget and each of the major category appropriations by the annual September 30 enrollment count of the school system for the previous year to calculate the average per pupil funding overall and per major category. . . .

We note that the total annual school system operating budget contains all funds-federal, State, and local including, e.g., Title I and special education funds. Therefore, with the exception of a student with disabilities for whom the IEP designates a nonpublic school placement, we find that an average per pupil amount derived from the total annual school system operating budget is sufficient for the charter school to deliver the services for which the school's students are eligible. The charter school will have to make budgetary allocations knowing its student population eligibility requirements and in doing so must comply with all applicable federal and State requirements.

For the special services that must be provided to its eligible students, the charter school must choose whether it

will provide those services directly or whether those services will be provided by the school system. If the latter, the charter school must reimburse the school system for salary, local retirement, and other fringe benefit costs for the public school employees working in the charter school as well as for regular services and supplies that the charter school requests the local school system to provide.

As we have discussed, the State Board has authority to interpret the "commensurate funding" requirement and to review the City Board's calculation of "commensurate" funding for the Charter Schools. If the State Board concludes, as it did in this case, that the City Board's per pupil funding level is not "commensurate," corrections can be made, as they were in this case. Thus, to the extent the City Board's methodology or calculations resulted in underfunding, the State Board had authority to correct that in accordance with its mandate to ensure that public charter schools received funding that is commensurate with traditional public schools in that jurisdiction. See Educ. § 2–205(e), § 9–109(a).

The City Board challenges the State Board's construction and application of the commensurate funding requirement in Educ. section 9–109(a). We consider each challenge in turn.

a.

## Funding Distinctions Between Elementary, Middle, Secondary

 Citing the language of section 9–109(a),[8] the City Board complains that "[t]he State Board adopted a funding formula based on a systemwide average per pupil amount that

8. According to the City Board, the "Senate committee that studied and debated the charter school issue for numerous years before the Act was enacted recently made clear that the State Board's decision is contrary to legislative intent." In support of that contention, the City Board offers a July 20, 2005 letter signed by four of the eleven members of the Education Committee. The Charter Schools object to this letter. They point out that the letter was first presented to this Court, and therefore was not part of the administrative record. See SG § 10–222(f)(1)("judi-

makes no distinction between elementary, middle, and secondary levels." To be sure, the State Board's decision does not explicitly address whether such a funding distinction is required by section 9–109(a). Nevertheless, we discern from the State Board's funding formula, template, and working papers that the State Board determined that per pupil funding differentiations by grade level are not necessary.

The statute specifies that the amount of money to be considered for purposes of calculating per pupil funding levels includes "county, State, and federal money *for* elementary, middle, and secondary students." *See* Educ. § 9–109(a)(emphasis added). The State Board read this as a direction to count the total amount of money earmarked for any and all of these grade levels. As we have explained, the State Board has a unique role in interpreting this statute, and its construction is not unreasonable, arbitrary, or illegal. The construction suggested by the City Board would require amending the statute to move this clause so as to read that local boards are required to provide funding "commensurate with the amount disbursed *for other public elementary, middle, and secondary schools* in the local jurisdiction." We see nothing in the language or history of subsection 9–109(a) that mandates such an interpretation.

### b.

### "Under-exclusions"

■■■ The City Board argues next that the State Board "inexplicably" excluded from the total annual school system

---

cial review of disputed issues of fact shall be confined to the record for judicial review supplemented by additional evidence taken pursuant to this section"). Even if the procedure for getting additional evidence into the record had been followed here, courts generally refuse to consider after-enactment statements of legislative intent offered by legislators. *See Kelly v. Marylanders for Sports Sanity, Inc.,* 310 Md. 437, 471 n. 18, 530 A.2d 245 (1987). We agree that this letter has no evidentiary value in this appeal. Written after the State Board's decision, it consists of irrelevant *post hoc* declarations of intent by four individual legislators who do not comprise a majority of the committee members.

operating budget "appropriations for debt service and for adult education[,]" but failed to exclude other similar categories of expenses. Although the two itemized "exclusions are correct," "the mistake made by the [State] Board was not excluding other similar categories" of expenses that also are not "disbursed to other public schools." In support, the City Board contends that

[a] logical, reasonable and rational reading of the statute is that the funding level should be commensurate with the amount of money which is expended by local school systems for direct classroom support, direct school administration and instructional support, custodial services and security services for students attending the public schools of that jurisdiction. That funding could be adjusted for special education, transportation and/or grants, based upon student specific program requirements for students actually enrolled in the charter school. The funding figure would be determined by taking the total amount of the school system's budget, and deducting from that amount, certain categories of expenses which do not directly support educational instruction and related items in "other public schools."

Among the categories of expenses that are "not disbursed to other public schools," and therefore should be excluded according to the City Board, are monies "expended in support of central office administration and area offices," and monies for fringe benefits for retirees, monies spent on risk management (including self-insurance for negligence liability, worker's compensation, and unemployment compensation). Another category of "excludable" expenses would involve "expenditures incurred by school systems that are . . . linked to specific or particular needs of students, as opposed to schools in general." These might include student transportation costs, special education, and grant-funded instructional costs (such as Head Start and Title I). The final exclusion, according to the City Board, should be "for maintenance of [school system] buildings and for utilities."

In defense of the State Board's funding decision, the Charter Schools dispute the City Board's "under-exclusion" as-

sumptions. We agree that the centralized business model presumed in the City Board's list of suggested exclusions cannot be applied to charter schools without undermining their reason for existing. As City Neighbors points out, the list of funding categories that the City Board wants to exclude in calculating a per pupil funding figure reflects a preference for the type of centralized business model that generates significant efficiencies and economies of scale for an entire school system. The Charter Schools are correct that "these economies of scale could only be achieved at the cost of the charter schools' very purpose" in creating an innovative and creative alternative to other public schools.

### c.

### Funding Disparity

Registering its ultimate complaint, the City Board asserts that the State Board has created "a two-tiered system of public schools, where charter schools actually receive far *more* funding than do traditional public schools." According to the City Board, under the State Board's funding plan, more money will be disbursed to charter schools than to other public schools because the City school system funds the latter schools through a combination of cash and services.

City Neighbors disputes that charter schools receive more funding than traditional public schools. For example, a charter school must provide transportation expenses, as well as other "special services" such as special education, to its eligible students, either by offering those services itself or by using the City's services and reimbursing the City Board for that with a portion of its per pupil funding. Consequently, charter schools "are not getting something for nothing," as the City Board posits.

We find City Neighbors' "dollar for dollar" illustration of funding parity persuasive. Citing expenditures for transportation and special education, City Neighbors demonstrates why the State Board's funding formula does not favor the charter schools. If the City Board spends an average of $307

per pupil on transportation, for example, and City Neighbors therefore receives an average of $307 per pupil to provide transportation (either itself or by reimbursing the City for its transportation services), then students will receive the same level of funding for transportation regardless of whether they attend City Neighbors or another non-charter public school in Baltimore. Similarly, because the State Board's funding plan provides City Neighbors with special education funding in the amount of $2,123 per pupil for eligible students enrolled at City Neighbors, there would be no disparity between the funding for special education students attending City Neighbors and special education students attending other public schools.

### 4.

### Deadline For Funding Determination

Section 9–104(b)(3) provides:

If the county board denies an application to establish a public charter school and the State Board reverses the decision, the State Board may direct the county board to grant a charter and shall mediate with the county board and the applicant to implement the charter.

The State Board interpreted and applied the 120 day statutory deadline in section 9–104(a)(4), in exercising authority under section 9–104(b)(3) to require completion of the charter agreements. The State Board concluded that,

based on the parameters we set forth below on commensurate funding, employee status, and waiver processes, the charter agreement must be completed within 30 calendar days from the date of the decision approving the charter application.

Emphasizing the "extensive amount of time that has elapsed since City Neighbors submitted its application ... and the urgency with [respect to the] next steps to have the charter school operational for the beginning of the 2005–2006 school year," the State Board "direct[ed] the parties to complete the charter agreement for City Neighbors within 15 business days of the date of issuance of this revised opinion." A similar

direction was included in the decision on Patterson Park's appeal.

 The City Board argues that the State Board did not have authority to order it to complete charter agreements with Patterson Park and City Neighbors. In City Neighbors' case, the proffered reason is that the authority granted to the State Board in section 9–104(b)(3) does not apply when the State Board is acting on a petition for a declaratory ruling. In Patterson Park's case, which did arise as an appeal from the denial of its application, the proffered reason is that the State Board's decision to treat that appeal as a petition for declaratory ruling requires the same result.

The City Board reads section 9–104 too narrowly. The State Board has authority to order the City Board to grant a charter, and to mediate in order to implement that charter, whenever it "denies an application" and the "State Board reverses the decision[.]" Educ. § 9–104(b)(3). In both of the cases here, the State Board treated the City Board's "conditional approval" and subsequent failure to reach a funding agreement as tantamount to a denial of the applications. We find nothing in the statute to support the City Board's conclusion that the State Board may not exercise such authority in cases where this type of *de facto* denial is challenged through a petition for a declaratory ruling rather than an appeal.

Moreover, we agree with the Charter Schools that the State Board has authority to impose a deadline on funding negotiations in such circumstances. The Board's power to do so derives from its broad authority to "decide all controversies and disputes under the[ ] provisions" of the Education Article. *See* Educ. § 2–205(d)(2). A contrary conclusion would allow a local board to prevent a charter school from appealing simply by approving the application subject to a condition that the local board never fulfills.

### E.

### City Board's Cross–Appeal: Substantial Evidence

 When the issue on judicial review turns on the correctness of an agency's findings of fact, we apply a substantial

evidence test. *See Bergmann v. Univ. of Md. Bd. of Regents,* 167 Md.App. 237, 892 A.2d 604 (2006). Evidence is substantial if a reasonable mind might accept it as adequate to support the conclusion reached by the agency. *See Bd. of Educ. of Prince George's County v. Waeldner,* 298 Md. 354, 363, 470 A.2d 332 (1984). The City Board complains that the record did not contain substantial evidence to support the funding figure reached by the State Board. We again disagree.

As a threshold matter, the City Board argues that "[t]he State Board erred in relying on a document that was not part of the administrative record before it." It points out that the funding formula attached to the State Board's decision as Exhibit 1 was not in the record considered by the State Board, because it was prepared by State Department of Education staff on May 4, 2005, after the April 19 hearing, just two days before the Board issued its initial decision.

The funding formula set forth in this document was not presented to the State Board as evidence for the simple reason that it is part of the State Board's decision. The funding template explains the State Board's funding decision, which is why it was drafted at the State Board's direction while the State Board was deliberating and preparing its decision.

Next, the City Board argues that the State Board inserted into its funding template numbers that were not supported by any evidence. Specifically, the State Board had no evidence to support its deduction of two percent from the per pupil funding figure as compensation/reimbursement for central office functions. According to the City Board, there is no such deduction in the law, "and the 2% figure is wholly made up by the State Board." The City Board posits that, if such an offset against the per pupil funding figure is warranted, the deduction should be higher because the City Board's actual costs for central services amount to approximately six percent of the total per pupil expenditure.

Again, the record refutes these complaints. The figures used in calculating per pupil funding for the 2006 school year

were taken from the City's approved operating budget for 2005, as the State Board noted in its decision. In addition, the Charter Schools' applications, as well as the City Board's responses, provide detailed budgetary and financial information regarding projected expenditures.

As for the two percent central services deduction, there is also substantial evidence explaining why the State Board selected that figure. Exhibit 2c to State Board's revised opinion, dated May 24, 2005, states as follows:

II. The current Financial Reporting Manual for Maryland Public Schools in the section for Cost Principles for State–Funded Grants (Appendix 1) allows the use of the restricted indirect cost rate not to exceed a maximum of 2 percent.

III. Given the administrative services required to be provided by the school system, the State Board may consider it an appropriate use of the Charter School funding to establish 2% of their annual allocation as a reasonable cost to the school and a reimbursement to the [City Board] central offices. E178.

Underneath these paragraphs is the following handwritten notation:

Approved by unanimous vote of the State Board of Education on May 25, 2005, that the total average per pupil amount shall be adjusted by a 2% reduction.

We conclude that the Financial Reporting Manual, which contemplated a two percent central services overhead cost, supports the offset for central services. Thus, the two percent deduction, although not mandated by law, was a reasonable adjustment to account for central office services.

### III.

### Patterson Park's Appeal: State Board's Authority To Grant Employee Status Waivers

In its application to the City Board, Patterson Park requested waivers of certain statutory rights afforded to public char-

ter school employees,[9] in accordance with Educ. section 9–106.[10] When these were not granted as part of the City Board's "conditional approval," Patterson Park asked the State Board to grant the waivers. The State Board declined that request, ruling that Patterson Park would have to file separate written waiver requests. Patterson Park did not appeal that decision to the circuit court.

Nevertheless, the Baltimore Teachers Union, American Federation of Teachers Local 340, AFL–CIO and the Baltimore City Municipal Employees Union, American Federation of State, County and Municipal Employees, Council 67, Local 44, moved to intervene in the judicial review action on the ground that they are aggrieved by the State Board's sugges-

---

9. Educ. section 9–108 provides:
 (a) Employees of a public charter school:
 (1) Are public school employees, . . .
 (2) Are employees of a public school employer . . . in the county in which the public charter school is located; and
 (3) Shall have the rights granted under Title 6, Subtitles 4 and 5 of this article [governing organizations of certificated and non-certificated employees].
 (b) If a collective bargaining agreement under Title 6, Subtitle 4 or Subtitle 5 of this article is already in existence in the county where a public charter school is located, the employee organization and the public charter school may mutually agree to negotiate amendments to the existing agreement to address the needs of the particular public charter school.

10. Educ. section 9–106 provides:
 (a) Subject to subsection (b) of this section, a public charter school shall comply with the provisions of law and regulation governing other public schools.
 (b) Subject to subsection (c) of this section, a waiver of the requirements under subsection (a) of this section may be sought through an appeal to the State Board.
 (c) A waiver may not be granted from provisions of law or regulation relating to:
 (1) Audit requirements;
 (2) The measurement of student academic achievement, including all assessments required for other public schools and other assessments mutually agreed upon by the public chartering authority and the school; or
 (3) The health, safety, or civil rights of a student or an employee of the charter school.

tion that it has authority to grant such waivers. The circuit court granted leave to intervene and ruled in favor of the Unions. The court held that the State Board may not grant waivers of existing collective bargaining agreements or of the statutory provision that charter school employees are public school employees.

Patterson Park appeals the circuit court's decision. It argues that the court erred in ruling on the waiver question because the issue was not ripe for judicial review given that the State Board did not grant or deny any waivers.

City Neighbors joins in the ripeness objection. Although it and other charter school applicants filed waiver requests with the State Board, they did so in separate proceedings before the State Board. The State Board granted some limited waivers. These decisions were the subject of a separate judicial review proceeding in the Circuit Court for Baltimore City, to which the Unions and City Board were parties from the outset. On April 6, 2006, the circuit court issued its decision and opinion in that proceeding.[11] *See Baltimore Teachers Union, Am. Fed. of Teachers, Local 340, AFL–CIO, et al. v. The Empowerment Academy, et al.,* Nos. 24–C–05–007845 (consol.), slip op. (Cir.Ct.Balt.City) (Nance, J.). That case is now being appealed to this Court.

 "Generally, an action for declaratory relief lacks ripeness if it involves a request . . . [to] 'declare the rights of parties upon a state of facts which has not yet arisen, [or] upon a matter which is future, contingent and uncertain.' " *Hatt v. Anderson,* 297 Md. 42, 46, 464 A.2d 1076 (1983). "To address issues which are non-justiciable because they are not ripe 'would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State.' "

---

11. The court interpreted the Maryland Public Charter Schools Act to prohibit the State Board from granting the type of waivers at issue in that proceeding.

*Heritage Harbour, L.L.C. v. John J. Reynolds, Inc.,* 143 Md.App. 698, 712, 795 A.2d 806 (2002).

 We agree with the Charter Schools that the waiver questions raised by the Unions were not ripe for judicial review in this action. The State Board did not make a decision regarding waiver in this action, because it ruled that any waiver request would have to be filed separately. Patterson Park did not petition for review of the State Board's decision and City Neighbors pursued its waiver requests in another proceeding before the State Board. Consequently, there was no waiver decision by the State Board in this matter, and therefore nothing for the circuit court to review. The circuit court should not have addressed the waiver issue. With no record, briefing, or oral argument with respect to the waiver issues raised by City Neighbors in the separate proceeding, and no jurisdiction over the other litigants in that case, the court should have refrained from addressing the waiver issues that were being separately litigated. Consequently, we shall vacate both the mootness and the waiver rulings in the circuit court judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED FOR ENTRY OF AN ORDER AFFIRMING THE STATE BOARD OF EDUCATION IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID 3/4 BY CROSS–APPELLANT BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS, 1/4 BY THE UNION APPELLEES.**